As the title of defendants is not invalid and unmerchantable because of the alleged defects urged by them, their reconventional demand for the return of the sum of $1,000, paid by them in cash at the date of the sale, and predicated upon such alleged defects in title, cannot be sustained, and is rejected.

For the reasons assigned, the judgment appealed from is affirmed.

---

(97 South. 21)

No. 24628.

## MOODY v. KENNY et al.

(April 30, 1923, Rehearing Denied June 4, 1923.)

*(Syllabus by Editorial Staff.)*

**1. Innkeepers ⬤⟾10—Petition for mistreatment of guest held to state cause of action.**

Petition alleging that, while plaintiff and her husband were occupying hotel room surrendered to them by registered occupant with clerk's consent, house detective, armed with deadly weapon, and accompanied by night watchman, challenged their right to occupy the room, questioned their statement that they were husband and wife, and refused to leave the room or permit the door to be closed, all in rude and insulting manner, *held* to state a cause of action.

**2. Innkeepers ⬤⟾8 — Guest of occupant of room sharing it without proprietor's knowledge is not guest of hotel.**

Mere guest of registered occupant of hotel room sharing it with the occupant without knowledge or consent of hotel management is not guest of the hotel, as there is no contractual relation.

**3. Innkeepers ⬤⟾8—One to whom occupant of room surrenders it with clerk's consent held a guest, though not registered.**

When registered occupant of hotel room with knowledge and consent of the management, turns it over to another person to whom the hotel clerk delivers the key, he becomes an accepted guest and not a mere licensee, though he fails, or is not required, to register.

**4. Innkeepers ⬤⟾8—Registration of guest not essential to contract.**

Hotel register is solely for benefit and convenience of the proprietor, and registration is no part of the contract, which is mere matter of oral consent and legal without further formality.

**5. Innkeepers ⬤⟾6—Have right to employ detectives and night watchmen.**

Proprietors of hotel have right to employ detectives and night watchmen to protect their property against fire and protect their guests against thefts, and to maintain order, decorum, and decency on the premises, and may police their premises.

**6. Innkeepers ⬤⟾10—Evidence held to support jury findings in favor of guest suing for mistreatment.**

In action against hotel proprietors by guest whose right to occupy room was challenged by the house detective in rude and insulting manner, evidence *held* to support jury's findings in favor of plaintiff.

**7. Innkeepers ⬤⟾10—Verdict in favor of guest for humiliating treatment for $5,000 reduced to $500.**

Where right of plaintiff and her husband to occupy hotel room surrendered to them by registered occupant with clerk's knowledge and consent was challenged by house detective in rude and insulting manner, verdict for $5,000 *held* excessive and to be reduced to $500.

O'Niell, C. J., dissenting.

Appeal from Civil District Court, Parish of Orleans; Wynne G. Rogers, Judge.

Action by Mrs. Annie May M. Moody against J. D. Kenny and others. From a judgment for plaintiff, defendants appeal. Amended and affirmed.

McCaleb & McCaleb, of New Orleans, for appellants.

Tally & Mayson, of Hattiesburg, Miss., and Miller, Miller & Fletchinger, of New Orleans, for appellee.

LAND, J. Plaintiff, the wife of Edgar A. Moody, a resident of Hattiesburg, Miss., has instituted the present suit against defendants, the proprietors of the Monteleone Hotel in the city of New Orleans, to recover the sum of $10,000 for damages.

[1] Plaintiff alleges substantially that, during the night of January 11, 1919, while she and her husband were occupying a room at said hotel, which had been surrendered to them by Mr. C. C. Bradley, its registered occupant, with the consent of the clerk of said hotel, the house detective, armed with a deadly weapon, to wit, a pistol, and accompanied by a night watchman, rapped violently on the door of her room, and that, when her husband opened the door, the detective demanded to know "what he was doing with that woman in there," in a loud, gruff, rude, angry, and insulting tone of voice, and that to this inquiry her husband replied that the lady was his wife.

Plaintiff alleges that then the detective, in a sneering, angry, loud, gruff, and insulting manner, replied, in her presence and hearing, after having pushed the door wide open, that, "That was all humbug, that, if that woman was your wife, why did you not register?" thereby charging plaintiff, in substance and effect, with being a disreputable and lewd woman; and that her husband undertook to tell the detective that the room had been turned over to him and to his wife by Mr. Bradley, with the knowledge and consent of the clerk of the hotel, but that the detective refused to listen to any statement, but told her husband, in her presence, in the same rude and uncivil tone, that he would have to go downstairs to the office and make his explanation there.

Plaintiff alleges that she earnestly requested the detective to get back out of the room so that she might arise from the bed and telephone the clerk of the hotel, so that the whole matter might be fully explained, but that this request was promptly and rudely refused.

Plaintiff alleges that, fearing a difficulty between her husband and the detective, she was forced to arise from her bed in her sleeping apparel, and that, as she arose from the bed she attempted to close the door until she could at least throw her kimona over her shoulders and get to the telephone, but that the detective, in an angry and threatening manner, pushed the door wide open and kept same open, so that she was compelled to arise in the presence of said hotel employer and telephone to the hotel clerk, and that the clerk requested her over the telephone to tell the two men to leave the room, and that she then informed them of the clerk's request, but that they ignored same, and arrested her husband and took him to the office, and that, upon being recognized by the clerk, he was released, returned to the room, spent the remainder of the night there, and next morning paid the bill for the use of the room and departed.

Plaintiff alleges that on account of the wanton and malicious conduct of the employees of said hotel, she was grossly abused, insulted, slandered, and humiliated, and made to endure great mental distress and mortification, for which she seeks redress in damages in the present suit.

The exception of no cause of action tendered by defendants was properly overruled, as the facts set forth in plaintiff's petition, if taken as true, necessarily show that plaintiff was a guest of the hotel, and that she was grossly insulted and mistreated, by its employee, while in the discharge of the duties for which he was employed.

[2-4] While a mere guest of the registered occupant of a room at a hotel, who shares such room with its occupant without the

knowledge or consent of the hotel management, would not be a guest of the hotel, as there would be no contractual relations in such case between such third person and the hotel proprietor; at the same time, when the registered occupant of a room, with the knowledge and consent of the hotel management, turns his room over to another person, and the hotel clerk delivers the key of the room to that person, he becomes an accepted guest of the hotel, and is not a mere licensee. The fact that such person fails to register, or is not required to register, is immaterial; as the registration of guests at a hotel is no part of the contract between the hotel proprietor and the guest, but the purpose of a register is to keep track of the number of people in the house and to keep the books straight. A register is kept solely for the benefit and convenience of the hotel proprietor.

A guest may be accepted at a hotel, without registration, by the mere delivery to him of the key to a room by the clerk. There is no law in this state requiring a guest to sign a hotel register as the evidence of the contract between the parties. Such contracts are mere matters of oral consent, and are legal without further formality.

The defense in this case is a denial of any misconduct towards plaintiff upon the part of defendant's employees, and the statement:

"That some time in January, 1919, a man and woman entered the room of Mr. Bradley in the Monteleone Hotel during the night, without the knowledge or consent of respondents. * * * That said man and woman had not registered, were not guests of the hotel, had no right to remain in said room without having registered; accordingly, the actions of said man and woman justified respondents' employees to inquire of said man why he had not registered with said woman as his wife."

[5] Defendants, as proprietors of a hotel, unquestionably have a right to employ detectives and night watchmen to protect their property against fire, and their guests against thefts, and to maintain order, decorum, and decency upon their premises. A legitimate exercise of the right to police their premises must be conceded. The complaint, however, in the present case, is not that defendants do not enjoy such necessary powers of police in their hotel, but that their employees exercised such powers against plaintiff in a grossly insolent manner, and without the slightest regard to her rights as a guest of the hotel to protection against insult and against the invasion of the privacy of her room by force, and without just cause or excuse.

[6] The night clerk and assistant manager of the Monteleone Hotel denied having seen Mr. or Mrs. Moody at the hotel, or having any conversation with them or with Mr. Bradley at any time prior to the invasion of the room of plaintiff by the house detective on the night of January 11, 1919; the purpose of such testimony being to show that plaintiff was not a guest of the hotel. Mrs. Moody testified, however, that she and her husband went to the hotel clerk and tried to obtain accommodations, but there were no vacant rooms to be had, and as they were getting ready to leave the hotel, Mr. Bradley, an acquaintance of theirs, came up, and went to the hotel clerk, handed him his key, and said to him:

" 'Let Mr. and Mrs. Moody occupy my room for to-night, and I will go elsewhere and sleep with a friend,' and the hotel clerk said, 'All right.' Mr. Bradley and my husband were ahead, and this young lady and I were behind, just a little behind them. He turned the key over to us, and we had a bell boy to take our baggage up, and he brought us some ice water."

Mr. Moody corroborates the testimony of his wife. The testimony of plaintiff and of her witnesses shows that plaintiff and her husband obtained the key to Mr. Bradley's room from the clerk of the hotel whenever called for, that Bradley's baggage was moved from the room, and that the hotel clerk gave them the key when they retired to their room

about 10:30 p. m. on the night of January 11, 1919.

The assistant manager of the hotel was pointed out in the courtroom at the trial by Mrs. Moody as the clerk to whom Mr. Bradley had spoken about the key to his room, and who had delivered the key to plaintiff and her husband.

Mr. Bradley also testified that he told one of the hotel clerks to "let Mr. and Mrs. Moody have my room, telling the clerk that I would room with a friend of mine. I do not recall what clerk I spoke to, but I know it was one of the clerks of the hotel."

This whole affair, in our opinion, is the result of the fault and negligence of the hotel clerk in not requiring plaintiff and her husband to register, and in not informing the clerk who came on later that Bradley's room was occupied by Mr. and Mrs. Moody.

As the jury rendered a verdict of $5,000 damages in this case against defendants, they evidently accepted the testimony of Mr. and Mrs. Moody and of Mr. Bradley, showing that plaintiff was a guest of the hotel, and rejected that of the night clerk and assistant manager to the contrary.

The jury also repudiated the testimony of the house detective and the night watchman as to what happened at the time of the invasion of plaintiff's room, these witnesses testifying to apparently decorous conduct on that occasion; while plaintiff and her husband's testimony supported the allegations in her petition as to the insult offered her and as to the rude treatment received at the hands of the hotel detective.

The verdict in this case was unanimous. The jurors were men of intelligence. They saw the witnesses and heard them testify, and noted the manner in which they gave their testimony. The opportunity of the jury for judging as to the credibility of the witnesses was much better than ours. They accepted the testimony of plaintiff and of her witnesses as presenting the true facts of the case, and as the testimony of the witnesses in this case is conflicting, we find no good reason why we should disagree with the jury as to their finding of facts in favor of plaintiff.

[7] The verdict and judgment, in our opinion, is largely excessive. The good name of the plaintiff needs no vindication at our hands, as she is unquestionably a married lady above all reproach. The injury to plaintiff's feelings is the only damage suffered by her, and we feel that the sum of $500 is adequate compensation for such injury, and will meet the ends of justice in the case.

The judgment appealed from is therefore amended by reducing the amount of said judgment from $5,000 to $500, and it is ordered that said judgment, as amended, be affirmed. Plaintiff to pay costs of appeal.

DAWKINS, J., concurs in the decree.

ROGERS, J., recused.

O'NIELL, C. J. (dissenting.) I do not find a preponderance of evidence in favor of the plaintiff in this case. However much we may defer to the good judgment of juries on questions of fact, in civil cases, the Constitution commands us to exercise our own judgment of the evidence in such cases.

From the size of the verdict, I have no doubt that the jury believed that the house officer, or house detective, as he is called, was guilty of the insulting and bulldozing conduct described in plaintiff's petition and in her testimony and that of her husband. But the jury's verdict in that respect has been virtually set aside by the majority opinion of this court, discounting the verdict 90 per cent.

Plaintiff's testimony was corroborated only by that of her husband, who is plaintiff in another action against this hotel company, for damages for his own account. With due respect, we must consider whether any witness is interested. The testimony of these

two witnesses, of the insulting conduct of the house officer, I say with respect, is highly improbable; and it is contradicted in part by the night clerk, and in full by the night watchman, and by the house officer himself. As practical men, we are not prone to believe that a house officer or detective, or any other employee, of any hotel of good repute, would, either willfully or carelessly, insult any guest of the hotel. The presumption is very strong the other way, for it is founded upon the reliable doctrine of self-preservation. The evidence in this case shows affirmatively, and it is not disputed, that the house officer who stands accused of this grossly insulting and unnatural conduct, for which the plaintiff here claims damages, is a courteous man, and does not drink intoxicants at all. As practical men, we judges know that no man other than a very intemperate man would be guilty of such conduct as the plaintiff and her husband have ascribed to the house officer in this case. And we know that the proprietors of respectable hotels, as a rule, do not hire intemperate men for house officers. In this case, the good reputation of the house officer, being undisputed, and being not at all consistent with the conduct that has been ascribed to him, ought to count for all that a good reputation is ever worth.

The testimony of the house officer and of the night watchman, that plaintiff was not subject to any insult on the occasion complained of, is corroborated by the acknowledged fact that plaintiff did not complain, and that her husband did not complain, to any one, either that night or the next morning. In fact, the first complaint that was ever made was the filing of this suit for damages, nearly a year after the occurrence.

The evidence leaves no doubt in my mind that plaintiff would not have suffered any embarrassment whatever if her husband had not lost his temper, or had been reasonable, when the house officer knocked at his door and asked about his having a woman in the room, as the officer had a right to do, under the circumstances. The mistake that caused the officer to inquire about the woman in the room was her husband's mistake, in failing to inform the night clerk of the circumstances under which she and her husband were occupying another man's room.

I respectfully dissent from the statement in the majority opinion in this case that a hotel register is kept solely for the benefit and convenience of the hotel proprietor. A hotel register is as necessary to protect a guest in his exclusive right to occupy a particular room, as it is necessary to protect the proprietor in his right to collect what the guest owes for occupying the room.

The circumstances under which the plaintiff and her husband occupied a room in the Monteleone Hotel without being registered there are not disputed. They called at the hotel, to register as guests, at about 2:30 p. m. on the day of the occurrence complained of; but the house was full. As they were leaving the hotel lobby, they met their friend, Mr. Bradley, and, after exchanging greetings, informed him of their disappointment. Bradley kindly offered them the use of his room temporarily, or until the hotel could accommodate them. Whether Bradley instructed the clerk to give them his key, or got the key himself and handed it to them, is a matter of no importance. They were given the key and went to Bradley's room, No. 235, and remained there about 30 minutes. Then they returned the key to the clerk at the desk and left the hotel. They returned to the hotel later in the afternoon, between 5 and 6 o'clock. Plaintiff's husband then went to the desk, asked the clerk whether there was yet a vacant room; and, being informed that there was not, asked for and was given the key to room 235. He and his wife, and a lady friend whom they had taken to the room on the first occasion, went again to the room and re-

mained there 20 or 30 minutes. Then they went out to a railroad station; and, the lady friend having departed, plaintiff and her husband returned to the hotel at or about 9 p. m. Plaintiff's husband again asked for and obtained the key to room 235 and they went to the room. In the meantime, that is, at 7 p. m., there had been a change of room clerks. The night clerk who gave plaintiff's husband the key to room 235 did not ask for an identification or make any inquiry as to the man's right to have the key. The night clerk had not been informed that Mr. Moody had already used Mr. Bradley's room that day, or that the latter had consented that Mr. and Mrs. Moody might use his room. Bradley had not checked out of the room. For all that the night clerk knew, the man to whom he handed the key to room 235 was Bradley himself. The clerk did not know that the man to whom he gave the key was accompanied by a lady. The day clerk, from whom plaintiff's husband got the key in the afternoon, was not obliged to tell the night clerk that Bradley had consented that Mr. and Mrs. Moody might use his room. The day clerk had no reason to suppose that plaintiff and her husband would call for the key again. If any one was at fault for the night clerk's ignorance of the understanding between Bradley and Mr. and Mrs. Moody, it was Mr. Moody. He knew that he was not registered as a guest of the hotel; and he knew that the night clerk was not the clerk who had given him the key to Bradley's room that afternoon. He had no right to suppose that the night clerk, or the night watchman, or the house officer or detective, or any other employee of a hotel of that size, would either know or take it for granted that he (Mr. Moody) and his wife, had the right to occupy a room that was assigned to some one else on the hotel register. When Mr. Moody got the key from the night clerk, it was Mr. Moody's duty to inform the clerk that Mr. Bradley had consented that he (Mr. Moody) and his wife might occupy Mr. Bradley's room.

I do not know how the clerks who hand out the room keys to the guests in large hotels identify the guests and avoid the mistake of giving a key to one who is not entitled to it. I imagine it would cause much embarrassment if the key clerks should require the guests to be identified every time one of them asks for the key to his room. For that reason, I suppose that the key clerks in the large hotels must rely upon their judgment of the honesty of the men who ask for keys to their rooms. That is what the night clerk of the Monteleone Hotel did in this instance. He took it for granted that the man who asked for the key to room 235 had a right to have it. If the clerk thought fast, and if he looked at the register before handing out the key, he thought, quite naturally, that the man's name was Bradley.

My opinion is that the situation was handled not ruthlessly but discreetly, by the night clerk and the house officer or detective, when the watchman discovered and reported that there was a woman in room 235. The reason why the night watchman was attracted by the lady's voice is that room 235 was in a part of the hotel where, as a rule, men only were assigned to rooms. When the watchman reported the matter to the night clerk, he examined the register and found that a man alone, named Bradley, was assigned to room 235. The clerk called the house officer and requested him to go and verify the watchman's report. The officer went up into the corridor, in front of room 235, and heard the lady's voice in the room. The officer did not then knock on the door, or make his presence known to the occupants of the room. He returned to the lobby and informed the clerk that the watchman's report was true. The clerk then had the operator at the switchboard to ring room 235, but did not receive a prompt answer. He then directed the

house officer to go to the room and investigate. The officer and the watchman went to the room together, and the officer knocked on the door. Plaintiff was then in bed. Her husband was sitting in the room, reading or writing. He answered the knock by asking who was there. The officer replied that it was he, the house officer. Plaintiff's husband then opened the door and asked what the officer wanted. The latter replied that he had come to inquire about the lady being in the room without being registered. Plaintiff and her husband say that the officer used the word "woman." He and the watchman say that he said "lady." That would be a matter of some importance if the officer had been acquainted with Mr. and Mrs. Moody; but he did not know them, and was not bound to know at his peril that they were a married couple. All that the officer knew, in that respect, was that the lady was in a room where she was not registered; and the officer had the right to inquire of the man in the room by what right the woman was there. The situation was naturally embarrassing to Mr. and Mrs. Moody. But that was not the officer's fault. Mr. Moody became very indignant and attempted to slam the door in the officer's face. The latter placed his foot in the way, with his toe braced against the edge of the door and his heel against the casing, and held the door in that position, while he talked to Mr. Moody. As soon as Mr. Moody said that he and his wife were occupying Mr. Bradley's room, the officer requested that Mr. Moody should go down to the office and register. He also suggested that Mr. Moody ring the night clerk and explain the matter to him. After some objection and discussion on Mr. Moody's part, he did ring the night clerk, and, at the latter's request, went down to the office and registered; and then, without further complaint, he returned to the room, and he and Mrs. Moody spent the night there.

It is admitted that the discussion between Mr. Moody and the officer, at the door of the room, was not heard by any one except Mr. and Mrs. Moody and the house officer and night watchman. The latter stood out in the corridor near the officer during the discussion. He corroborated the officer's statement that he was not armed. They and the night clerk testified that Mrs. Moody did not use the telephone during the discussion between the officer and her husband. The officer and the watchman testified that they did not see Mrs. Moody get out of bed, or see her at all; and, as no one could know as well as they knew whether they did or did not see her in the room, I have no reason to doubt their statement that they did not see her.

If the night clerk had refused to take Mr. Moody's word for it, that the lady occupying the room with him was his wife, and that they had permission from Mr. Bradley to occupy his room, and if, on Mr. Moody's being unable to be identified at that hour of the night, the clerk had ordered him and Mrs. Moody out of the room, it might be said that the clerk was too severe. But it seems to me that the clerk did all that could reasonably be expected of a hotel clerk, when he took the word of a stranger that he and the lady, occupying a room where they were not registered, had permission from the man to whom the room had been assigned, to sleep in his room.

And let me say, in this connection, that the testimony of Mr. Bradley, although it was taken at the instance of the plaintiff, was not at all favorable to her case. Having related the circumstances under which he had allowed the plaintiff and her husband to use his room, he said:

"From what I have stated, the house detective had no way of knowing whether or not Mr. and Mrs. Moody were guests of the Monteleone."

I believe that whatever mistake was made by the hotel clerk, or by the house detective, in this instance, was a pardonable mistake.

Mr. and Mrs. Moody must have thought so, too, at the time, or they would have complained to the management, and would have demanded an apology, before they departed from the hotel. I am not in favor of allowing damages for a pardonable mistake, when the injury complained of cannot be measured in dollars and cents and the condemnation therefore would be very much like an infliction of punishment. I do not know how the management of the large hotels can maintain their respectability if they cannot with impunity inquire into the right of a strange man and woman to occupy a room where another man is registered as a guest of the hotel.