## MAYO HOTEL CO. v. DANCIGER.

No. 19156. Opinion Filed April 1, 1930.

Rehearing Denied May 27, 1930.

Hulette F. Aby, William F. Tucker, and Frank Settle, for plaintiff in error.

R. C. Allen, I. J. Underwood, and H. L. Smith, for defendant in error.

HALL, C. This action was instituted by Jack Danciger, defendant in error, and who will be hereinafter designated as plaintiff, against the Mayo Hotel Company, a corporation, the plaintiff in error, and hereinafter designated as defendant, to recover both compensatory and exemplary damages against the defendant, said hotel company, because of certain personal injuries which he received at the hands of one of the servants of the hotel company while plaintiff was a guest of defendant's hotel. The material facts are as follows:

The defendant operated and operates the Mayo Hotel in Tulsa, Okla. On the 23rd and 24th days of December, 1925, the plaintiff, his wife, and six year old daughter were guests at this hotel and occupied a room exclusively for themselves, for which they paid the regular price for its occupancy. It is alleged that on the night of the 23rd of December, plaintiff's wife opened the door of her room leading to the hallway, and a man named Bowles, who was a detective or house policeman for the hotel company, fell into the room, but immediately ushered himself on the outside without any particular explanation as to his presence. However, the testimony relating to Bowles falling into the room is purely hearsay, as it was denied by Bowles and was not seen by plaintiff. Plaintiff says he was in the bathroom and heard some commotion, and his wife told him that a man had fallen into the room. Plaintiff, however, went outside of his room, found Bowles there, and started an argument, or demanded an explanation from him. Bowles denied the accusation and each "contingent" withdrew without bloodshed.

On the following night, according to plaintiff's testimony, he and his wife and child were en route to their room from the hotel elevator, and they saw Bowles lurking about their room. Plaintiff's wife made some remark to the effect that it appeared that they would have company again. That situation seemed to be unsatisfactory to plaintiff, and he started a rather tempestuous argument with Bowles, speaking in a somewhat loud tone of voice and protesting against Bowles' "hawkshaw" habits; and then Bowles, who was armed with a six-shooter and a "blackjack" (a kind of a weapon composed of lead slugs covered with leather and suspended to a flexible handle), struck plaintiff in the face with this latter weapon. The blow did not knock plaintiff down, but dazed him considerably. It was committed in the presence of his wife and child and perhaps a negro bell-hop and a white newsboy. The weapon struck plaintiff on the cheek below the eye. Plaintiff expended $8 for medical treatment, two visits from a physician and $15 for an X-ray photograph. The evidence disclosed that no bones were broken, and that the only physical injury done was a flesh bruise, from which plaintiff, in about the usual time, recovered. It appears from plaintiff's testimony that he suffered much humiliation, mental worry, and anxiety over the affair, and that it disorganized him completely for several weeks. However, plaintiff's physician testified that there was no necessity for medical treatment after he saw him the second time, which was about one week after the injury.

Plaintiff asked for $10,025 actual damages, and $5,000 exemplary or punitive damages. The petition contained two causes of action. The second cause of action involved the matter of exemplary damages only. The jury returned a verdict upon which judgment was pronounced, for actual or compensatory damages in the sum of $1,025, and $5,000 for punitive damages. The defendant appealed and in seeking to reverse the judgment, its counsel in substance advanced the following propositions:

(1) That an innkeeper is not liable for unlawful acts of violence of a servant acting beyond the scope of his employment; and that the servant in this case was acting without such scope.

(2) That it was error to submit to the jury certain issues of fact, of which it is claimed there was no competent evidence to

support the same, or which were not covered by the pleadings.

In this connection, it contends (a) that the submission to the jury of the matter contained in instruction No. 5, which authorized a recovery against the defendant because of the trespass committed by the servant Bowles in falling into plaintiff's room, was error; and (b) the submission to the jury of the question of the permanent nature of plaintiff's injuries when the cause of action was not based upon permanent injuries, but temporary injuries only, and that there was no evidence warranting submission of that question to the jury.

(3) That the judgment should be set aside because it is obvious that the jury was influenced by bias or prejudice; and

(4) That exemplary or punitive damages cannot be recovered in an action of this nature.

The first and fourth propositions go to the very foundation of plaintiff's cause of action, and therefore they will be considered first, because, if these contentions of defendant should be sustained, the whole structure of plaintiff's cause of action falls.

We think the first contention of defendant is without merit, both in point of law and in fact. It is the contention of the defendant that the duty of an innkeeper to protect his guests against the tortious acts of his servants is restricted to only ordinary care, and that as the defendant did not employ the house officer, Bowles, to commit unwarranted acts of violence upon its guests, but employed him for other purposes, the hotel company is not responsible for his malicious and tortious acts.

To sustain such a contention would certainly establish a new and novel rule in jurisprudence. It would exonerate or immunize in all cases all corporations and all masters for the willful misconduct of their agents or servants, because neither a corporation nor an unincorporated business institution employs men to commit actionable negligence or to commit unwarranted assaults upon persons. Counsel for plaintiff in error cite a few cases, not cases involving an innkeeper, however, save and except one, which tend to announce such an absurd doctrine. The case tending to support defendant is Clancy v. Barker, 131 Fed. 161. The other cases involved a pool of water, a restaurant, a furniture store, a storage warehouse, and a freight depot where the plaintiff returned to renew a controversy which was commenced over the company's business but degenerated into a personal brawl.

An examination of the case law upon the subject has convinced the writer that the great weight of the authorities is to the effect that, instead of an innkeeper's liability being restricted to ordinary care, it is fixed at a "very high degree of care." In all the cases save one, where the degree of care is discussed, or where the liability is made to depend upon the degree of care owing the plaintiff, it is said that the relation existing between an innkeeper and his guest is almost identical with that existing between a common carrier and its passenger. Commonwealth v. Power, 7th Metc. (Mass.) 596, 41 Am. Dec. 465; Trulock v. Willey, 187 Fed. 956, 112 C. C. A. 1; Clancy v. Barker, 71 Neb. 83, 98 N. W. 440, 103 N. W. 446, 69 L. R. A. 642, 115 Am. St. Rep. 559, 8 Ann. Cas. 682; DeWolfe v. Ford, 193 N. Y. 397, 86 N. E. 527, 21 L. R. A. (N. S.) 860, 127 Am. St. Rep. 969; Dalzell v. Dean Hotel Co., 193 Mo. App. 379, 186 S. W. 41; Rice v. Warner Hotel Co., 201 Ill. App. 530; Lawrence v. Bumpas, 194 Ala. 69, 69 So. 566, Ann. Cas. 1918E, 252; Lehnen v. Hinds & Co., 88 Kan. 58, 127 Pac. 612, 42 L. R. A. (N. S.) 830; Overstreet v. Mosier, 88 Mo. App. 72; Norcross v. Norcross, 53 Me. 163; Pinkerton v. Woodward, 33 Cal. 557, 91 Am. Dec. 657. Even in the case of Davidson v. Chinese Republic Restaurant Co., 201 Mich. 389, 167 N. W. 967, L. R. A. 1918E, 704, where the Michigan Supreme Court distinguished the rule of liability of the proprietor or keeper of a restaurant from the rule of liability attached to innkeepers, the similarity of the rule relating to the contract of carriage and the contract undertaken by a hotel keeper, is expressly recognized. This case, in quoting from one of its former decisions, Johnston v. Detroit, etc., Ry. Co., 130 Mich. 453, 90 N. W. 274, said:

"The principal contention of the defendant is that the company is not liable for this act of the conductor, because not within the scope of his authority. We think the rule relieving the master from liability for a malicious injury inflicted by his servant when not acting within the scope of his employment does not apply between a common carrier of passengers and a passenger, and that it is the duty of the carrier to protect its passengers against injury from the willful misconduct of its servants while performing the contract to carry." (Citing numerous cases from other states).

Perhaps the clearest statement of the rule is by the Supreme Court of Kansas in

Lehnen v. Hinds & Co., supra, quoting in part from Beale on Innkeepers and Hotels as follows:

"Speaking of the implied obligation of the hotel keeper to protect guests against third persons, as well as against the wrongs of servants, it has been said in Beale on Innkeepers and Hotels, sec. 172, that an injury inflicted by a servant negligently or intentionally is a breach of the duty of the hotel keeper; and it is added that: 'The innkeeper's duty, the breach of which by his servant causes the injury, is not the negative duty not to assault the guest, but the affirmative duty to protect him from assault. The servant, in assaulting the guest, is committing the tort for himself; but he is also breaking the obligation of protection which rests on the innkeeper, and which the servant has himself been employed to carry out.'"

A statement of the rule which has been many times quoted, and which seems to have met with universal approval by the courts, was formulated by the United States Circuit Court of Appeals in Trulock v. Willey, 187 Fed. 956, 112 C. C. A. 1, as follows:

"The relation existing between an innkeeper and his guest is much like that existing between a common carrier and its passenger, and while not an insurer of the personal safety of the guest, the proprietor of the hotel is held, and ought to be held, to the exercise of a very high degree of care for the protection of his guests against the negligent acts of servants employed therein."

It is everywhere recognized that the duties of a hotel keeper to his guests spring from the implied terms of its contract to treat the guests with due consideration for their comfort and safety, just as in the case of a common carrier to its passengers. The only essential difference between the obligations, or the implied contracts of the hotel keeper and a carrier of passengers, is the fact that in Oklahoma the carrier, by virtue of a specific statute. section 4892, Comp. Stat. 1921, is subjected to an additional burden in that. as against certain things enumerated in the statute, it is in effect an insurer; that is. pertaining to certain duties the carrier is not relieved of liabilty by any degree of care. That is not true as to the implied contract between the innkeeper and his guest.

The Nebraska case of Clancy v. Barker. supra, has been quoted with approval by many of the highest courts of the different states, including Oklahoma. Seay v. Plunkett, 44 Okla. 794, 145 Pac. 496. It is accepted as the rule except perhaps by some of the federal courts. It is criticised by the federal courts only in that it fixed li-

ability upon the hotel company for the tortious acts of a servant who was not at the time actively engaged in the discharge of any duty on behalf of the hotel. The rule observed generally by the federal courts would fix liability against the company for acts within the scope or apparent scope of the employment, or in the performance of some duty growing out of the master's business, but would deny liability for acts not within the scope of the employment, or where the acts were not committed while the servant was actively engaged in some manner in the business of the master. In this, the federal courts distinguish between liability of the hotel keeper and a common carrier. The rule announced in the second paragraph of the syllabus in the case of Clancy v. Barker (71 Neb. 83,) is as follows:

"A trespass committed upon the guest in the hotel by a servant of the proprietor, whether actively engaged in the discharge of his duties at the time or not, is a breach of such implied undertaking, for which the proprietor is liable in damages."

The case of DeWolfe v. Ford, by the highest court of the state of New York, 193 N. Y. 397, 86 N. E. 527, 127 A. S. R. 969, is a leading case on the liability of an innkeeper for the torts of its servants committed against its guests. In the course of the carefully considered opinion in that case, the court made these appropriate observations:

"There may doubtless be many conditions under which a guest at an inn may be assaulted or insulted by another guest, or by an outsider without subjecting the innkeeper to liability, but if it ever was thought to be the law that an innkeeper and his servants have the right to willfully assault, abuse, or maltreat a guest, we think the time has arrived when it may very properly and safely be changed to accord with a more modern conception of the relation of innkeeper and guests."

Defendant's fourth proposition involved the question of exemplary damages. In this connection, counsel for defendant contends that the submission of that question to the jury and their finding in favor of plaintiff on that issue, was reversible error.

There are numerous cases holding that exemplary damages are not recoverable against corporations, because of the torts of its agents and servants. Under that rule corporations would never be liable at all, because a corporation can act only through its agents and servants. These cases are considerably in the minority, and their doctrine has been generally expressly repudiated. Many courts hold that there is no rational

basis for a distinction between the guilt of the servant and the guilt of the corporation, or the malice of the servant and the malice of the corporation. There are, however, respectable authorities, some of them recent ones, definitely holding that a corporation cannot be subjected to exemplary damages because of the malicious, fraudulent, or oppressive tortious acts of its agents and servants where such acts are not authorized or afterwards ratified by the corporation. Many of the state courts and a majority of the federal courts expressly adhere to that doctrine. On the other hand, courts of equal respectability, and with much plausible reason, subscribe to the contrary doctrine, which is clearly stated by the author of Thompson on Corporation (3d Ed.) vol. 7, sec. 5501, as follows:

"In these jurisdictions, when the wantonness and malice of subordinate agents and servants is established, the corporation is imputed with this malice or watonness although it was not authorized or ratified by the management of the corporation. In support of this view, it has been said: 'If corporations—artificial beings, who can act only through agents and servants—in their varied and multitudinous and constantly recurring business dealings with the public, can never be held liable in punitive damages for the acts of their servants unless expressly authorized by them, or unless expressly ratified by them, no matter how gross and outrageous the wrongful act of the servants, we feel perfectly safe in declaring that no recovery for more than mere compensatory damages will ever again be awarded against corporations. Corporations never expressly authorize their servants to beat or insult or outrage those having business relations with them, and they rarely ratify such conduct. Having, by the constitution of their being, to act solely by agents or servants, they must, as a matter of sound public policy, be held liable for all the acts of their agents and servants who commit wrongs while performing the master's business, and in the scope of their employment, and this to the extent of liability for punitive damages in proper cases.'"

The foregoing section of the text is largely a quotation from the opinion of the Supreme Court of Mississippi in the case of Pullman Palace Car Co. v. Lawrence, 74 Miss. 782, 22 So. 53. The states apparently adhering to this rule are Alabama, Connecticut, Illinois, Indiana, Kansas, Maine, Mississippi, Missouri, New Hampshire, New York, North Carolina, Ohio, South Carolina, Tennessee, some of the Canadian provinces, and Oklahoma.

Defendant places considerable reliance upon the case of Emmke v. De Silva, 293 Fed. 17. It is true that that case involved an action by a guest against the hotel company for malicious insults inflicted by a servant of the defendant while performing his master's business. The case expressly denies the right in such cases to fix exemplary damages against the corporation. But the case belongs to that class of cases committed to the doctrine that "the servant (in that case the manager owning a majority of the stock) is not the corporation," and is without power to commit a tort such as will result in exemplary damages against the corporation. That is not the rule in Oklahoma. The rule obtaining in this state has been declared by this court in the cases of Fort Smith & W. R. Co. v. Ford, 34 Okla. 575, 126 Pac. 745, and St. Louis & S. F. Ry. Co. v. Clark, 104 Okla. 24, 229 Pac. 779; and Atchison, T. & S. F. Ry Co. v. Vosburg, 132 Okla. 196, 270 Pac. 58. In the Clark Case a ticket agent for a railway company, without justification, used abusive language to a young man who was frail in health and who was attempting to purchase a ticket over defendant's railroad to go to a government hospital in another state. Evidently the boy was not prepared for front line action, and he retreated to some place up in the town, which was the city of Miami. After the train arrived, the conductor was informed of the incident, and he held the train and sent a messenger after the boy, but the boy did not know what would happen and refused to go. The young man, however, did go and take passage the following day. In an action against the railway company, the jury awarded the plaintiff compensatory damages, and in addition thereto exemplary damages in the sum of $2,000, because of the oppressive conduct and evil motive of the defendant's agent. This court upheld the verdict and judgment.

In the Vosburg Case, the holding and rule announced in the second paragraph of the syllabus is as follows:

"Where a conductor of a passenger train, engaged in the furtherance of his employer's business, and acting within the scope of his employment, wrongfully ejects a passenger from his master's train in a manner showing the servant to be grossly negligent and indicating a disregard of the rights of the passenger, in an action against the master based thereon, exemplary damages may be allowed against the master irrespective of whether or not the wrongful act of the servant was authorized or ratified."

From these decisions it would seem that this court is committed to the doctrine that the legal malice of the servant is the legal malice of the corporation. We therefore hold that it was not error for the trial court

to submit to the jury the question of exemplary or punitive damages.

The next objection of defendant to the proceedings is directed at the action of the court in submitting instruction No. 5 to the jury, in which instruction, in substance, the jury were told that the plaintiff would have a right of action, without limitation as to damages except as to the amount prayed for in the petition, against the defendant, because of the alleged entrance of the room of the plaintiff on the night preceding the night of the difficulty; that is, the night preceding the assault upon defendant which is the subject-matter of this controversy. The court, in a separate instruction, properly instructed the jury regarding the liability of the defendant for the alleged assault which its servant committed on plaintiff. It is the contention of plaintiff in error that instruction No. 5, which assumed the existence of a separate cause of action in favor of plaintiff for the incidents or what had happened on the previous day, finds neither support in pleadings nor in testimony.

Unquestionably, we think this contention is well taken. First, plaintiff in his pleadings does not attempt to predicate his cause of action upon any trespass upon plaintiff's premises; to wit his room or his person, on the night of December 23rd, but bottoms his cause of action upon what occurred the following evening, to wit, December 24th, at which time, during an argument between plaintiff and defendant's house detective Bowles, plaintiff was struck in the face by this house detective, and that such assault and the results of it constitute the basis of plaintiff's cause of action. The separate cause of action related wholly to the claim for exemplary damages based upon the alleged wanton and oppressive conduct of Bowles, the defendant's servant, in striking plaintiff with the blackjack. Plaintiff recited in his petition the incident which occurred on the night of December 23rd, but it clearly appears that he did so as preliminary or introductory to the explanation of his allegations in connection with the incident and the assault occurring on the night of which plaintiff complains. The plaintiff did not attempt to base his cause of action on the servant's intrusion into the room.

Second, there was no competent evidence, direct or indirect, tending to establish the contention or justify the action of the court in submitting said instruction No. 5 to the jury. The only testimony before the court on this point was the testimony of the plaintiff and testimony of the house detective Bowles.

Plaintiff testified that he was in the bathroom with his child at the time Bowles supposedly fell into the room. His information that Bowles fell into the room was told to him by his wife. Even that hearsay is to the effect that Bowles did nothing but fall into the room and frighten plaintiff's wife. It seems he, Bowles, immediately absented himself. Plaintiff testifies that he got out of the bathroom after being informed by his wife of the incident and went out in the hallway and looked Bowles up and demanded an explanation. It might serve some useful purpose to relate the testimony in verbatim concerning this incident and dialogue between plaintiff and Bowles:

"Q. Where she opened the door, could you see to that point? A. No, sir. Q. Did you see the door open? A. No, sir. Q. Did you see the detective precipitated into the room? A. No, sir. Q. You did not see any of that? A. No, sir. * * * A. My wife told me. * * * And I went up to him and asked him why he was in the room and told him that he must have been leaning against the door to fall in on her * * * and he denied that he had been leaning against the door, but could not explain why he fell into the room. The Witness: We did not want to have any one falling in on us again that night. Mr. Bowles then remarked that he did not fall in on us. I told him that he did fall in on us, and that he had no right to butt in on our room and fall in against my wife."

The defendant moved to strike this testimony. The jury was told to disregard it. After some extended dialogue between the court and the attorney for the defendant, the court took over the witness and the following proceedings were had:

"By the Court: Q. Is that all you know about this man being precipitated into the room? Is that all you know about it? A. I went up to him immediately and he admitted it and told me he would do what he damned please. He admitted it to me."

It is clearly revealed from this testimony that all plaintiff knew about the alleged incident about Bowles falling into the room was what his wife had told him. He neither saw the occurrence nor did Bowles admit it, but expressly denied it; therefore, his remark or reply to a question propounded him by the court that he admitted it was only a conclusion, as he had expressly and repeatedly testified quoting Bowles to the effect that Bowles denied falling into the room. Therefore, the submission of an instruction authorizing the jury to find the defendant to be guilty of a breach of duty because of this supposed infraction was fundamental and prejudicial error. The jury

were properly instructed that they might find in favor of plaintiff and against the defendant for the tortious act of Bowles for assaulting plaintiff as alleged in the petition and as testified to by the plaintiff. This testimony was contradicted by the witness Bowles, and how can we say that a portion of the jury did not find for plaintiff because of the supposed intrusion of Bowles in plaintiff's room on the night of December 23rd, and an equal portion discarded that theory and found for plaintiff by reason of the assault inflicted upon him the following night? Assuming that we might say, as a matter of law, that the jury was warranted in finding for plaintiff because of the assault, then, in such event, how could we determine that the submission of the other issue did not inhance the damages assessed?

Third. It appears to us from the facts pleaded and the evidence attempted to be introduced, regarding the incident relating to Bowles falling into plaintiff's room, the matter, in so far as affecting the plaintiff, was but a naked trespass, and no consequential damages following by reason of any fright or injury to his wife—that the actionable negligence, other than for nominal damages, if any, regarding this occurrence, would be in favor of plaintiff's wife, and her only. That appears to be elementary.

It is next contended by the defendant that the court committed reversible error in submitting to the jury an instruction warranting them in finding that plaintiff suffered permanent injuries. This assignment of error is based upon the proposition that the plaintiff did not plead nor prove permanent injuries; that is, he did not say that his injuries were permanent, **and that the nature of the injuries specifically alleged did not indicate in themselves that they were necessarily permanent.**

Without expressing an opinion as to the harmful results of this instruction, if any, in this particular case, it is sufficient to say that the instruction should not have been given.

It is next contended that the cause should be reversed because it is obvious that the jury was influenced by bias or prejudice. That proposition is based upon the amount of the verdict in regard to exemplary damages. It is claimed that the enormity of the verdict as to this element of damages was influenced by the erroneous rulings of the court and matters submitted to the jury, and for the further reason that counsel for plaintiff in their argument continually referred to the fact that plaintiff's wife was prevented from

testifying by the act of the defendant, and also because of statements made by plaintiff's counsel at the time the court sustained defendant's objection to the competency of plaintiff's wife as a witness. A sample of the alleged objectionable matter is as follows (from the evidence):

"Q. State your name to the court and jury. A. Mrs. Jack Danciger. Q. Were you in the Mayo Hotel on the night of December 23, 1925? Q. (By Mr. Tucker): Are you the wife of the plaintiff, Jack Danciger? A. Yes. (Objection to competency of witness). * * * Mr. Smith: We want all the facts in this case. The Court: Sustained. * * * (Motion by defendant.) The Court: Yes, you should disregard the remarks of any counsel when a matter is not in the case."

From the argument (in presence of the jury):

"Mr. Tucker: The defendant objects to the statement of counsel to the jury to the effect that plaintiffs were endeavoring to present all the facts to the jury and were prevented by defendant's refusal to permit Mrs. Danciger to testify. We except to that statement and ask that the jury be instructed that she was not a proper witness and was not permitted to testify under the laws of the state of Oklahoma."

"Mr. Smith (attorney for plaintiff): In that connection, I want the record to show that the attorney for plaintiff at this time states that the defendant had the right to waive the statute if he desired to do so. and that is the point we are making to the jury in our argument."

(Objection sustained, and jury admonished to disregard the statements).

"Mr. Smith: On the night of the 23rd, this fellow was at the door, and Mr. Danciger testified. You see we could not, over their objection, bring Mrs. Danciger around as a witness and prove what happened."

Of course the court sustained objections to these remarks, but we wonder what effect that had upon the minds of the jurors. The mental processes of men are stronger than any word of admonition from a court. To tell them to forget some dramatic event, or some vivid picture, and expect them to do so, would be absurd. We understand the rule to be that. when improper argument is made and the jury is instructed to disregard it, the same is not necessarily reversible error in every case, but is reversible error where it is evident that the remarks did substantially affect the verdict rendered. Judging from the adjudications on questions of similar import, it is most likely that something more than the testimony in the case

affected the verdict for exemplary damages. Hurd v. Hotel Astor Co., 169 N. Y. S. 359; Moody v. Kenney, 153 La. 1007, 97 South. 21, 29 A. L. R. 474; Boyce v. Greeley-Square Hotel Co., 168 N. Y. S. 191; Newcomb Hotel Co. v. Corbitt, 27 Ga. App. 365, 108 S. E. 309; Florence Hotel Co. v. Bumpas, 194 Ala. 69, 69 So. 566, Ann. Cas. 1918E, 252.

In the foregoing cases the question of exemplary damages was not discussed; but the cases bear a close analogy to the present case in that each case cited involved an action against a hotel company for the malicious conduct of its servants employed therein.

For the reasons herein stated, the judgment of the trial court is hereby reversed, with directions to grant a new trial.

LEACH and HERR, Commissioners, concur. DIFFENDAFFER and EAGLETON, Commissioners, concur in result. BENNETT, Commissioner, dissents.

By the Court: It is so ordered.

Note.—See under (1) anno. 12 L. R. A. (N. S.) 1155; L. R. A. 1918E, 708; 17 A. L. R. 142; 14 R. C. L. p. 507; R. C. L. Perm. Supp. p. 3624. (2) 26 R. C. L. p. 779; (3) 7 R. C. L. p. 647; R. C. L. Perm. Supp. p. 2049; (5) 2 R. C. L. p. 242; R. C. L. Perm. Supp. p. 402. See "Appeal and Error," 4 C. J. §2939, p. 959, n. 90. "Corporations," 14a C. J. §2858, p. 782, n. 24. "Damages," 17 C. J. §279, p. 983, n. 71; §284, p. 986, n. 7; p. 987, n. 11, 12. "Innkeeper," 32 C. J. §69, p. 562, n. 59, 63; §79, p. 566, n. 55. "Trial," 38 Cyc. p. 1485, n. 62.