**Bill DILL, Appellant,**

v.

**Dean RADER, Individually and as Mayor of the City of Weatherford, Oklahoma, et al., Appellees.**

**No. 46891.**

Court of Appeals of Oklahoma,
Division No. 2.

March 4, 1975.

Released for Publication by Order of the Court of Appeals March 27, 1975.

H. K. Myers, Hollis, John V. Arney, Weatherford, for appellant.

Milton Keen, Oklahoma City, for appellees.

BRIGHTMIRE, Judge.

Weatherford's Watergate . . . that is what one might characterize the circumstances occurring in the small southwestern Oklahoma community giving rise to this conspiracy and slander action by a discharged policeman against the municipality, its mayor, councilmen, and chief of police. Plaintiff appeals from an order sustaining demurrers to his amended petition of all defendants except the police chief's.

According to his petition plaintiff served as an officer employed by the City of Weatherford's police department until November 18, 1971. Earlier in the fall he had supported the unsuccessful effort of various citizens to get enough signatures on a petition to require the empaneling of "a Grand Jury to inquire into the conduct of the business of the City of Weatherford, and the operation of the Police Department." Motivated by this activity and a desire to discourage plaintiff from bringing a threatened lawsuit, continued plaintiff's allegations, Mayor Rader, Councilmen Jameson, Fruechting, McPhetridge and Teasley, and Police Chief Harrelson, "actng in their respective official capacities, conspired to discharge the plaintiff from the Weatherford Police Department in order to create an opening for a former police officer." In furtherance of these objectives defendants decided to justify plaintiff's discharge by agreeing upon a plot "to blacken [his] name and reputation." The plan called for Chief Harrelson to commence a verbal assault on plaintiff and assassinate his character by spreading a number of vicious and false defamatory statements round about town.

Pursuant to the conspiracy Chief Harrelson did go first one place then another describing plaintiff as the "biggest con-artist

around here" who is unfit for and "incapable of handling his job" as a policeman. Other malicious slander included a statement that the department had definite proof that plaintiff had "raped a 16 year old girl in the back of his Police car," purchased beer for a minor boy, and had given "false identification to minors so that they could buy beer and then arrested those individuals who sold it to the minors."

In regard to the city itself plaintiff pled that the conspiracy was formed and carried out "for the benefit of the City" in its "proprietary capacity" by councilmen who were acting within the scope of their authority and Harrelson who was "acting within the scope of his employment as Chief-of-Police of Weatherford, Oklahoma." The benefit accruing to the city, it is alleged, was "to frighten, coerce and intimidate" and thereby "discourage the plaintiff from any further actions against the City of Weatherford."

■ It is elementary of course that in ruling on a general demurrer the facts pleaded or proved are taken as true along with those inferable therefrom. As mentioned above the petition does allege that the mayor, councilmen, and chief of police consummated their conspiracy to destroy plaintiff's good reputation by devastating slander *per se*.

■ Two or more persons may involve themselves in a conspiracy by agreeing either to achieve an unlawful objective, or a lawful objective by unlawful means. Hughes v. Bizzell, 189 Okl. 472, 117 P.2d 763 (1941). The allegations here, as we have seen, disclose that neither the goal sought nor the means employed were lawful. Slander, being a verbal defamatory publication, may be either the aim of a conspiracy or a means of carrying one out. The complained of slander in this case is of the "per se" variety—charging plaintiff with a crime and imputing to him a general lack

of attributes required by his calling—12 O.S.1971 § 1442. Matter of fact circulating such false rumors or character-destroying slander is a crime in this state. 21 O.S.1971 § 781.

■ We hold plaintiff has stated a cause of action against the mayor and councilmen and therefore it was error to sustain their demurrers.

The City of Weatherford's demurrer presents a more difficult problem. Liability against it is not premised on any conspiratorial participation but on the vicarious theory of respondeat superior regarding an unimmunized nongovernmental function.

■ A resolution of this problem must begin with identifying the rule governing a municipal corporation's tort liability. Generally the functions of an incorporated city fall into two categories: (1) governmental, and (2) corporate, ministerial, or proprietary. While acting in the former capacity it enjoys sovereign immunity from liability for the misfeasance of its agents and servants.[1] But when it performs in the latter capacity "its responsibilities and liabilities are the same as are those of private corporations or individuals in the conduct of such an enterprise." Oklahoma City v. Foster, 118 Okl. 120, 247 P. 80 (1926).

Two questions immediately arise. One—was the police chief here dispatched on a ministerial mission? Two—if he was, what vicarious liability would a private corporation have under such circumstances?

■■ It must be said in regard to the first issue that to say the complained of acts of the mayor, councilmen and chief of police could be at the same time a criminal conspiracy and a governmental function seems to us a conceptual contradiction. None of the functions of government can in the nature of things consist of criminal activity—in theory at least—nor does the law, generally speaking, recognize as un-

---

1. Except for a limited lifting of liability by the "Governmental Tort Liability Act," 11 O.S. 1971 § 1751 et seq.

lawful the means used to fulfill sovereign responsibilities. Distinguishable is the fact that those in charge of the government may and have been known to engage in criminal and other unlawful activities under the guise of performing functions of government. But as the court pointed out in *Foster*—a case holding that the police chief, in knowingly furnishing a defective motorcycle to a policeman who was injured in the line of duty as a result, was performing a proprietary function on behalf of the city—the distinction between the two functions is determined by the "character of the duty performed, rather than the department, officer, or agent of the corporation by whom the duty is performed. . . . The test is not that of casual or incidental connection. If the duty in question is substantially one of a local or corporate nature, the city cannot escape responsibility for its . . . performance because it may in some general way also relate to a function of government." The conclusion we reach is that when a municipality through its officials, agents and employees engages in a criminal or unlawful act, it sheds for that purpose its mantle of sovereignty and assumes the status of a private corporation.

■ Here since heading off the threat of a lawsuit by plaintiff against Weather-

ford was the alleged purpose of the conspiracy, it follows that the defending officials had to be trying to protect some proprietary municipal interest because the city had immunity for its governmental acts. Thus the conspirators were acting for their principal in its corporate capacity.

The second issue brings into focus the rather disquieting disarray of decisional dialogue tending to dichotomize the law of corporate tort liability—one for bill collectors; another for all others.

Prefatorily one notes that notwithstanding courts sometimes use the phrases "scope of authority" and "scope of employment" interchangeably, the results reached in various decisions dealing with a corporation's vicarious liability for a servant's intentional tort or crime suggest the two terms are distinguishable and that it is the latter rather than the former that controls the imputation.[2]

The distinction was recognized in Ada-Konawa Bridge Co. v. Cargo, 163 Okl. 122, 21 P.2d 1 (1932) with reference to a suit for damages by one who, while crossing a toll bridge, was shot by the toll collector for failure to pay the toll! After adopting the general rule that a master or principal was liable for the willful wrongs committed by a servant or agent in excess of authority conferred on them if "such acts are

---

2. See, for instance, the discussion in Chicago, Rock Island & Pac. Ry. v. Radford, 36 Okl. 657, 129 P. 834 (1913) saying on the one hand that, "A corporation may even be held liable for a libel, or a malicious prosecution, by its *agent* within the *scope of his employment*; and the malice necessary to support either action, if proved in the agent, may be imputed to the corporation," and on the other hand, "In Chicago, R. I. & P. Ry. Co. v. Holliday, 30 Okl. 680, 120 P. 927, 39 L.R.A.,N.S., 205, [1911] we held that a private corporation, like an individual, is liable for the acts of its agent in instituting a malicious prosecution, if the same was done while acting within the *scope of his authority*. . . ." (emphasis ours)

*Holliday*, incidentally, seems to recognize the distinction. At one point the court said: "The fact that the servant, in committing the tort, may have been exceeding his actual authority or even disobeyed his express in-

structions, does not alter the rule [that the master is liable] . . . ." At another point this language from a Kansas case was adopted: "To make the corporation responsible, it is not necessary . . . that the principal should have directly authorized the particular wrongful act of the agent, or should have subsequently ratified it. . . . [T]he principal is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances . . . of his agent in the course of his employment, although the principal did not authorize, or justify, or participate in, or, indeed, know of, such misconduct, or even if he forbade or disapproved of them. . . . In all [such] cases . . . the rule applies, respondeat superior, and it is founded upon public policy and convenience, for in no other way could there be any safety to third persons in their dealings . . . ." with corporations.

incidental to and one in furtherance of the business of the master," the court refers to "course of employment" as though it were synonymous with scope of employment and defines it this way:

"But in general terms it may be said that an act is within the 'course of employment' if (1) it be something fairly and naturally incident to the business, and if (2) it be done while the servant was engaged upon the master's business and be done, although mistakenly or ill advisedly, with a view to further the master's interest, or from some impulse of emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account."

Two years before *Cargo* the state supreme court handed down an opinion in Mayo Hotel Co. v. Danciger, 143 Okl. 196, 288 P. 309 (1930) [3] opening the way for plaintiff to obtain both a compensatory and punitive damage judgment against the corporate employer of a hotel house detective who blackjacked a hotel guest during a heated argument which followed some unexplained interference by the hotel policeman with the guest's right of privacy. Denouncing as "absurd" the argument of the corporation that it should not be liable for its house officer's unwarranted acts of violence because it did not hire him to do that, the court approved not only an award for actual damages but for punitive as well saying, ". . . [T]his court is committed to the doctrine that the legal malice of the servant is the legal malice of the corporation." The rationale underlying this holding was the realistic observation that "[c]orporations never expressly authorize their servants to beat or insult or outrage those having business relations with them, and they rarely ratify such conduct. Having, by the constitution of their being, to act solely by agents or servants, they must, as matter of sound public policy, be held liable for all acts of their agents and servants who commit wrongs while performing the master's business, and in the scope of their employment, and this to the extent of liability for punitive damages in proper cases."

The next significant decision was handed down in Hill v. McQueen, 204 Okl. 394, 230 P.2d 483, 22 A.L.R.2d 1220 (1951). There, Hill, the general manager of a partnership d/b/a Johnson Seed Company accosted one of its debtors, McQueen, at the close of a meeting of the Oklahoma Seedmen's Association,[4] and said his company's president wanted him to talk to him about what he (McQueen) intended to do about the balance due on his note. McQueen said he had turned the matter over to his Tulsa attorney. Angry words ensued culminating in an assault. Plaintiff achieved a jury verdict against both Hill and the Johnson Seed Company. In what appears to be an abrupt but unacknowledged departure from earlier established law, the supreme court reversed the judgment as to Johnson Seed Company saying the court should have directed a verdict as to it because even though Hill had incidental authority as general manager to collect his employer's debts and was inquiring of McQueen about the note he owed at the express direction of the company president, "We deem it to be clear that in committing the assault Hill was acting without the *scope of his employment* . . . ." (emphasis ours) This latter phrase the court used as though it meant the same as "scope of an agent's authority" as demonstrated by this statement: "Herein the fact of the agency is established and the question in issue is whether, in contemplation of law, the assault was committed within the scope of the agent's authority."

The court in *McQueen* did not mention *Danciger*, but it did refer to *Cargo* and *Radford* saying, "The authority of the

---

3. Reversed and remanded for a new trial because of an instructional error.

4. McQueen was the association's secretary and Hill had just been elected president of it.

servant in each of those cases differs both in character and degree from that which obtained in the instant case. The payment of the toll in the one case [*Cargo*] and the fare in the other was a condition precedent to the enjoyment of a right or privilege. The duty of the employee in substance was to get the toll or fare or to withhold the enjoyment of the right or privilege. Successful performance involved *immediate action of some kind* in opposition to the will of the other and therefore (shooting) *was to be anticipated by the employer*.

"No such action can properly be contemplated as an incident to the exercise of ordinary authority to collect indebtedness." (emphasis ours)

Of course the ratiocination underlying the distinction made is far too subtle for our perception. Particularly is this true when it comes on the heels of approving this explanatory exposition of "scope of authority": ". . . [A] railroad company is responsible in damages to a trespasser for torts committed upon him by a servant who, in the commission of the tort, is acting in the line of his employment and within the scope of his authority; not within the scope of his authority as applied to the commission of the tort, for no authority for such commission could be conferred, but within the scope of his authority to rightfully do the particular thing which he did do in a wrongful manner."

To us the court by this explanation is really saying that it is the scope of employment (or agency) that counts and the test is whether the agent or servant's willful tort grew out of or was connected with the performance of something lawful he was obliged to do for his principal or master— as distinguished from engagement in a purely personal matter unrelated to his employment or agency. But if this is the re-

cited rule it was not applied. Besides introducing a new predicatory requirement that a master be able to forecast his servant's malfeasance, perhaps because of the dicta enveloping *McQueen,* its holding for purposes of stare decisis should be restricted precisely to protecting employers of assaulting debt collectors from liability requiring us to move on to the supreme court's next relevant decision.

It came some ten years later in Henry v. Carpenter, Okl., 366 P.2d 928 (1961). In that case Henry was employed as a "Safety Director" by National Trailer Convoy, Inc. One day he was taken by a National vice president in a National car to the "Jones Garage" for the purpose of retrieving an "expenses" check issued earlier to a former National employee. At the garage Henry found the check possessor. When Henry's verbal demand for the check failed it was reinforced with physical persuasion sufficient to induce delivery of the check. Whether out of gratitude, remorse, fear, or for some other reason, Henry and the corporate official took the battered plaintiff to a hospital and the coveted check to National's treasurer. The supreme court upheld a jury verdict against National for the malicious mugging, not on the basis of existing general law as promulgated in *Cargo, Radford,* and *Danciger,* but on the theory of implied ratification by knowingly retaining the fruits of the crime —a theory incidentally found among the dicta recited in *McQueen.*[5]

A distillation of these cases can come no closer to a reconciliatory general rule than this: ". . . that a master or principal is liable for the tortious acts of his servant or agent," even though the actions exceed "authority conferred . . . or [were] willfully or maliciously committed . . . .." if "such acts are inciden-

---

5. Said the court in *McQueen*: "An employer is liable for the unlawful and criminal acts of his employe only when he directly authorizes them, or ratifies them when committed, or, perhaps, continues an employe in his employment after he has knowledge that the employe has committed, or is liable to commit,

unlawful acts while in the pursuit of his employer's business."

Of course the latter conduct suggests a breach of duty on the part of the employer rather than vicarious imputation of liability.

cf. Urabazo v. Humpty Dumpty Supermarkets, Okl.Ct.App., 463 P.2d 352 (1969).

tal to and . . . in furtherance of the business of the master or principal." (emphasis ours) Allison v. Gilmore, Gardner & Kirk, Inc., Okl., 350 P.2d 287 (1960).

These several rules have been applied specifically to municipal corporations. A premier case is Munick v. City of Durham, 181 N.C. 188, 106 S.E. 665, 24 A.L.R. 538 (1921). There it happened that an old and feeble man tapped his cane into the city water department one day to pay his bill. Part of the payment consisted of 50 pennies. As the clerk stood counting them the water department manager came up to the counter and scraped the copper coins off with an angry swipe of his hand so that they fell with a scattering clatter onto the dirty floor below. And while executing this discommodious gesture, the city official began cursing the frail and forlorn old man and ordered him to pick up the pennies. When the melancholy figure did not act quickly enough his tormentor cruelly struck him a blow. Still not satisfied with the ignominious result obtained, the despairing victim was dragged into a nearby room where, in the umbra of greater privacy, the savage superintendent ignored the pitiable pleas of the pliant patron and resumed a bestial beating that included choking and suffocation by a towel held over his face . . . until, at last, when plaintiff tendered a dollar bill, it ceased and the wounded, whimpering plaintiff was released with the arrogant demand to take his pennies, leave, and not come back. This brutal and unprovoked attack upon a man of good character was not contradicted.

The court concluded that the city was operating the waterworks in its "business capacity" (as distinguished from governmental) and it was not only vicariously liable for its manager's vicious criminal assault because its officer was "acting in the discharge of his duty," but "further, it was the duty of the corporation . . . to protect" plaintiff from foreseeable harm—a duty which it could be said to have breached.

More recently the Florida Supreme Court reached a similar result in City of Miami v. Simpson, Fla., 172 So.2d 436 (1965). After pointing out that liability of a municipal corporation for its employees' torts is the same as that of private employers, the court frames a helpful criterion thus: "If the tort is activated by a purpose to serve the master or principal, then he is liable. Otherwise he is not."

■ It is a wise and just public policy for the law to make its artificial creatures responsible for the harm inflicted by those through whom they must act so long as harm is inflicted while the agent or servant is on duty, on the job, or fulfilling an employment-related mission; and the complained of act is incident to or activated by such service to the master or principal. Roring v. Hoggard, Okl., 326 P.2d 812 (1958) (Syl. 1, 2 & 3).

■ In the instant case we think a liberal construction of plaintiff's pleading places him within the rule. One of the duties of the city officials is to protect its corporate employer from lawsuits and the expense of defending or losing them. This being the duty alleged to have been the object of fulfillment by the conspiracy in question it matters not that the zeal of the municipal overseers overcame their awareness of the legal bounds of their authority. If the law is to protect its subjects from the abuse of corporate power it must do so by means not only of positive restraints but negative preventative inducements such as imposition of liability for the harm wrought by its willful wrongs as well.

We hold plaintiff's petition states a cause of action against the City of Weatherford as well as the other defendants and therefore the judgment below is reversed, except as to the Chief of Police, and the cause remanded for further proceedings.

NEPTUNE, P. J., and BACON, J., concur.