# AMERICAN SOCIETY OF MECHANICAL ENGI-NEERS, INC. *v.* HYDROLEVEL CORP.

No. 80–1765.   Argued January 13, 1982—Decided May 17, 1982

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., filed an opinion concurring in the judgment, *post*, p. 578. POWELL, J., filed a dissenting opinion, in which WHITE and REHNQUIST, JJ., joined, *post*, p. 578.

*Harold R. Tyler, Jr.*, argued the cause for petitioner. With him on the briefs were *Richard D. Parsons, Frederick T. Davis*, and *Steven C. Charen.*

*Carl W. Schwarz* argued the cause for respondent. With him on the brief were *Stephen P. Murphy* and *William H. Barrett.*

*Deputy Solicitor General Shapiro* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Assistant Attorney General Baxter, Barry Grossman*, and *Ernest J. Isenstadt.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Petitioner, the American Society of Mechanical Engineers, Inc. (ASME), is a nonprofit membership corporation organized in 1880 under the laws of the State of New York. This case presents the important issue of the Society's civil liability under the antitrust laws for acts of its agents performed

---

*Briefs of *amici curiae* urging reversal were filed by *Michael D. Brown* for the American Association of Engineering Societies, Inc.; by *Lewis H. Van Dusen, Jr.*, for the American Society for Testing and Materials; by *Robert J. Siverd* for the Institute of Electrical and Electronics Engineers, Inc.; by *David Crump* for the Legal Foundation of America; and by *Daniel J. Piliero II* for the National Fire Protection Association.

*Merle L. Royce* and *James P. Chapman* filed a brief for ECOS Electronic Corp. as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Henry A. Field, Jr.*, for Adolph J. Ackerman; and by *Kim Zeitlin* for the National Commission for Health Certifying Agencies.

with apparent authority.   Because the judgment of the Court of Appeals upholding civil liability is consistent with the central purposes of the antitrust laws, we affirm that judgment.

I

ASME has over 90,000 members drawn from all fields of mechanical engineering.   It has an annual operating budget of over $12 million.   It employs a full-time staff, but much of its work is done through volunteers from industry and government.   The Society engages in a number of activities, such as publishing a mechanical engineering magazine and conducting educational and research programs.

In addition, ASME promulgates and publishes over 400 separate codes and standards for areas of engineering and industry.   These codes, while only advisory, have a powerful influence: federal regulations have incorporated many of them by reference, as have the laws of most States, the ordinances of major cities, and the laws of all the Provinces of Canada.   See Brief for Petitioner 2.   Obviously, if a manufacturer's product cannot satisfy the applicable ASME code, it is at a great disadvantage in the marketplace.

Among ASME's many sets of standards is its Boiler and Pressure Vessel Code.   This set, like ASME's other codes, is very important in the affected industry; it has been adopted by 46 States and all but one of the Canadian Provinces.   See id., at 5.   Section IV of the code sets forth standards for components of heating boilers, including "low-water fuel cutoffs."   If the water in a boiler drops below a level sufficient to moderate the boiler's temperature, the boiler can "dry fire" or even explode.   A low-water fuel cutoff does what its name implies: when the water in the boiler falls below a certain level, the device blocks the flow of fuel to the boiler before the water level reaches a dangerously low point.   To prevent dry firing and boiler explosions, ¶ HG–605 of Section IV provides that each boiler "shall have an automatic low-water fuel cutoff so located as to automatically cut

off the fuel supply when the surface of the water falls to the lowest visible part of the water gage glass." Plaintiff's Exhibit 30A. See 635 F. 2d 118, 121 (CA2 1980).

For some decades, McDonnell & Miller, Inc. (M&M), has dominated the market for low-water fuel cutoffs. But in the mid-1960's, respondent Hydrolevel Corporation entered the low-water fuel cutoff market with a different version of this device. The relevant distinction, for the purposes of this case, was that Hydrolevel's fuel cutoff, unlike M&M's, included a time delay.[1]

In early 1971, Hydrolevel secured an important customer. Brooklyn Union Gas Company, which had purchased M&M's product for several years, decided to switch to Hydrolevel's probe. Not surprisingly, M&M was concerned.

Because of its involvement in ASME, M&M was in an advantageous position to react to Hydrolevel's challenge. ASME's governing body had delegated the interpretation, formulation, and revision of the Boiler and Pressure Vessel Code to a Boiler and Pressure Vessel Committee. See App. 120. That committee in turn had authorized subcommittees to respond to public inquiries about the interpretation of the code. An M&M vice president, John W. James, was vice chairman of the subcommittee which drafted, revised, and interpreted Section IV, the segment of the Boiler and Pressure Vessel Code governing low-water fuel cutoffs.

After Hydrolevel obtained the Brooklyn Union Gas account, James and other M&M officials met with T. R. Hardin,

---

[1] M&M's fuel cutoff is a floating bulb that falls with the boiler's water level. When the level reaches the critical point, the bulb causes a switch to cut off the boiler's fuel supply. Hydrolevel's product, in contrast, was an immovable probe inserted in the side of the boiler; when the water level dropped below the probe, the fuel supply was interrupted. Because water in a boiler surges and bubbles, the level intermittently would seem to fall slightly below the probe even though the overall level remained safe. To prevent premature fuel cutoff because of these intermittent fluctuations, Hydrolevel's probe included a time delay that allowed the boiler to operate for a brief period after the water level dropped beneath the probe.

the chairman of the Section IV subcommittee.[2]   The participants at the meeting planned a course of action.   They decided to send an inquiry to ASME's Boiler and Pressure Vessel Committee asking whether a fuel cutoff with a time delay would satisfy the requirements of ¶HG–605 of Section IV. James and Hardin, as vice chairman and chairman, respectively, of the relevant subcommittee, cooperated in drafting a letter, one they thought would elicit a negative response.

The letter was mailed over the name of Eugene Mitchell, an M&M vice president, to W. Bradford Hoyt, secretary of the Boiler and Pressure Vessel Committee and a full-time ASME employee.   App. 62.   Following ASME's standard routine, Hoyt referred the letter to Hardin, as chairman of the subcommittee.   Under the procedures of the Boiler and Pressure Vessel Committee, the subcommittee chairman— Hardin—could draft a response to a public inquiry without referring it to the entire subcommittee if he treated it as an "unofficial communication."

As a result, Hardin, one of the very authors of the inquiry, prepared the response.   *Id.*, at 63.   Although he retained control over the inquiry by treating the response as "unofficial," the response was signed by Hoyt, secretary of the Boiler and Pressure Vessel Committee, and it was sent out on April 29, 1971, on ASME stationery.   *Id.*, at 64.   Predictably, Hardin's prepared answer, utilized verbatim in the Hoyt letter, condemned fuel cutoffs that incorporated a time delay:

> "A low-water fuel cut-off is considered strictly as a safety device and not as some kind of an operating control.   Assuming that the water gage glass is located in accordance with the requirements of Par. HG–602(b), it is the intent of Par. HG–605(a) that the low-water fuel

---

[2] Hardin was an executive vice president of Hartford Steam Boiler Inspection and Insurance Company.   A controlling interest in Hartford was owned by International Telephone and Telegraph Corporation, which acquired M&M within the year.   See 635 F. 2d 118, 122, n. 2 (CA2 1980).

cut-off operate immediately and positively when the boiler water level falls to the lowest visible part of the water gage glass.

"There are many and varied designs of heating boilers. If a time delay feature were incorporated in a low-water fuel cut-off, there would be no positive assurance that the boiler water level would not fall to a dangerous point during a time delay period." *Ibid.*

As the Court of Appeals in this case observed, the second paragraph of the response does not follow from the first: "If the cut-off is positioned sufficiently above the lowest permissible water level, a cut-off with a time-delay could assure, even allowing for the delay, that the fuel supply would stop by the time the water fell to the lowest visible part of the water-gauge glass." 635 F. 2d, at 122–123. Hoyt signed and mailed the response without checking its accuracy. See App. 124–126.

As anticipated, M&M seized upon this interpretation of Section IV to discourage customers from buying Hydrolevel's product. It instructed its salesmen to tell potential customers that Hydrolevel's fuel cutoff failed to satisfy ASME's code. See 635 F. 2d, at 123. And M&M's employees did in fact carry the message of the subcommittee's response to customers interested in buying fuel cutoffs. Thus, M&M successfully used its position within ASME in an effort to thwart Hydrolevel's competitive challenge.

Several months later, Hydrolevel learned of the subcommittee interpretation from a former customer. Hydrolevel wrote ASME for a copy of the April 29 response. On February 8, 1972, over the signature of the assistant secretary of the Boiler and Pressure Vessel Committee, ASME sent Hydrolevel a letter quoting the two paragraphs of the April 29 interpretation of Section IV. App. 66–67.

On March 23, Hydrolevel's president wrote Hoyt and demanded that ASME cure the effect of the April 29 letter by sending a correction to whomever might have received it.

*Id.*, at 68–73.   Hoyt placed Hydrolevel's complaint on the agenda for the meetings of the Boiler and Pressure Vessel Committee and Subcommittee to be held on May 4 and 5.

On May 4, the subcommittee voted to confirm the intent of the first quoted paragraph of the April 29 letter.   James, by then the chairman of the subcommittee, reported this recommendation to the committee on May 5.   *Id.*, at 82.   Thereafter, the committee designated two persons to propose a response to Hydrolevel.   *Id.*, at 83.   In the end, on June 9 the committee mailed Hydrolevel a reply that "confirmed the intent" of the April 29 letter.   *Id.*, at 84.[3]   The committee's letter further advised that there was

> "no intent in Section IV to prohibit the use of low water fuel cutoffs having time delays in order to meet the requirements of Par. HG–605(a).   This paragraph relates itself to Par. HG–602(b) which specifically delineates the location of the lowest visible part of the water gage glass." *Ibid.*

The committee concluded the letter with a warning paragraph suggested by James, see *id.*, at 111–112:

> "If a means for retarding control action is incorporated in a low-water fuel cutoff, the termination of the retard function must operate to cutoff the fuel supply before the boiler water level falls below the visible part of the water gage glass." *Id.*, at 84.

After this response to its complaint, Hydrolevel continued to suffer from market resistance.   Two years later, the Wall Street Journal published an article describing Hydrolevel's predicament in trying to sell a fuel cutoff that many in the industry thought to be in violation of ASME's code.   Wall Street Journal, July 9, 1974, p. 44, col. 1; App. 94–98.   Re-

---

[3] Actually, the committee "confirmed the intent" of ASME's February 8, 1972, letter to Hydrolevel.   That letter, however, simply quoted the original April 29, 1971, response.   See App. 66–67.

acting to this story, ASME's Professional Practice Committee opened an investigation. It never discovered that James had been involved with the original inquiry. In a resolution reporting the results of its investigation, the committee decided that all ASME officials had acted properly. Further, the Professional Practice Committee "commend[ed] [James] for conducting himself in a forthright manner." *Id.*, at 104.

Subsequently, James' part in drafting the original letter of inquiry became public because of his testimony in March 1975 before a Senate Subcommittee. See Voluntary Industrial Standards: Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 186–199 (1975) (testimony of John W. James of M&M (ITT)); see also *id.*, at 171–185 (testimony of Eugene Mitchell, Manager of Original Equipment Sales, ITT Fluid Handling Division). Within a few months, Hydrolevel filed suit against ITT, ASME, and Hartford in the United States District Court for the Eastern District of New York. Hydrolevel alleged that the defendants' actions had violated §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2. App. 11. Prior to trial, Hydrolevel sold all its assets, except this suit, for salvage value. Ultimately, ITT and Hartford settled.

The lawsuit proceeded to trial against ASME, as the remaining defendant. Hydrolevel requested the trial court to instruct the jury that ASME could be held liable under the antitrust laws for its agents' conduct if the agents acted within the scope of their apparent authority. See *id.*, at 59. The District Court, however, rejected this approach and, instead, at ASME's suggestion, charged the jury that ASME could be held liable only if it had ratified its agents' actions or if the agents had acted in pursuit of ASME's interests. The District Court explained to the jury:

> "If the officers or agents act on behalf of interests adverse to the corporation or acted for their own economic benefit or the benefit of another person or corporation,

and this action was not ratified or adopted by the defendant [ASME], their misconduct cannot be considered that of the corporation with which they are associated." *Id.*, at 49.

The jury, nonetheless, returned a verdict for Hydrolevel.

Before the Court of Appeals, the parties disputed the sufficiency of the evidence to support a verdict based on the District Court's instruction. See 635 F. 2d, at 125. But the Court of Appeals chose not to decide whether the evidence was sufficient to demonstrate that ASME had ratified its agents' actions or that the agents had acted to advance ASME's interests. Instead, after surveying the law of agency and the policies underlying the antitrust laws, the Court of Appeals concluded that ASME could be held liable if its agents had acted within the scope of their apparent authority. *Id.*, at 124–127. Since, therefore, the District Court had delivered "a charge that was more favorable to the defendant than the law requires," *id.*, at 127, the Court of Appeals affirmed the judgment on liability, that is, the jury's finding that ASME was liable under § 1 of the Sherman Act for its agents' actions.[4]

Because the Court of Appeals' decision presents an important issue concerning the interpretation of the antitrust laws, we granted certiorari. 452 U. S. 937 (1981).

## II

### A

As the Court of Appeals observed, under general rules of agency law, principals are liable when their agents act with

---

[4] The Court of Appeals remanded the case to the District Court after finding that the damages awarded Hydrolevel were excessive and that the District Court had made errors in its calculation of damages. 635 F. 2d, at 128–131. The damages issue is the subject of a pending cross-petition for certiorari, No. 80–1771, filed April 22, 1981. Hydrolevel's damages arguments are not now before us, and we express no opinion on that aspect of the Court of Appeals' decision.

apparent authority[5] and commit torts analogous to the antitrust violation presented by this case. See generally 10 W. Fletcher, Cyclopedia of the Law of Private Corporations ¶ 4886, pp. 400–401 (rev. ed. 1978); W. Seavey, Law of Agency § 92 (1964). For instance, a principal is liable for an agent's fraud though the agent acts solely to benefit himself, if the agent acts with apparent authority. See, *e. g.*, *Standard Surety & Casualty Co.* v. *Plantsville Nat. Bank*, 158 F. 2d 422 (CA2 1946), cert. denied, 331 U. S. 812 (1947). Similarly, a principal is liable for an agent's misrepresentations that cause pecuniary loss to a third party, when the agent acts within the scope of his apparent authority. Restatement (Second) of Agency §§ 249, 262 (1957) (Restatement); see *Rutherford* v. *Rideout Bank*, 11 Cal. 2d 479, 80 P. 2d 978 (1938). Also, if an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the defamatory statement. Restatement §§ 247, 254. Finally, a principal is responsible if an agent acting with apparent authority tortiously injures the business relations of a third person. *Id.*, § 248 and Comment *b*, p. 548.

Under an apparent authority theory, "[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." *Id.*, § 261, Comment *a*, p. 571. See *Record* v. *Wagner*, 100 N. H. 419, 128 A. 2d 921 (1957). As with the April 29 letter issued by the Boiler and Pressure Vessel Subcommittee, the injurious statements are "effective, in part at least, because of the personality of the one

---

[5] "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8 (1957).

publishing it." Restatement §247, Comment *c*, p. 545. In other words, "one who appears to have authority to make statements for the [principal] gives to his statements the weight of the [principal's] reputation," *ibid.*—in this case, the weight of ASME's acknowledged expertise in boiler safety. See generally W. Prosser, Law of Torts 467 (4th ed. 1971).

ASME's system of codes and interpretative advice would not be effective if the statements of its agents did not carry with them the assurance that persons in the affected industries could reasonably rely upon their apparent trustworthiness. Behind the principal's liability under an apparent authority theory, then, is "business expediency—the desire that third persons should be given reasonable protection in dealing with agents." Restatement §262, Comment *a*, p. 572. See *Ricketts* v. *Pennsylvania R. Co.*, 153 F. 2d 757 (CA2 1946). The apparent authority theory thus benefits both ASME and the public whom ASME attempts to serve through its codes: "It is . . . for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal." Restatement §262, Comment *a*, p. 572.

The apparent authority theory has long been the settled rule in the federal system. See *Ricketts* v. *Pennsylvania R. Co.*, 153 F. 2d, at 759. In *Friedlander* v. *Texas & Pacific R. Co.*, 130 U. S. 416 (1889), the Court held that an employer was not liable for the fraud of his agent, when the employer could derive no benefit from the agent's fraud. But *Gleason* v. *Seaboard Air Line R. Co.*, 278 U. S. 349 (1929), discarded that rule. In *Gleason*, a railroad's employee sought to enrich himself by defrauding a customer of the railroad through a forged bill of lading. The Court of Appeals had absolved the railroad from liability because the employee perpetrated the fraud solely for his own benefit. But this Court re-

versed, overruling *Friedlander.* 278 U. S., at 357. Noting that "there was . . . no want of authority in the agent," *id.*, at 355, the Court held the railroad liable despite the agent's desire to benefit only himself. It explained that "few doctrines of the law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own." *Id.*, at 356.

In a wide variety of areas, the federal courts, like this Court in *Gleason,* have imposed liability upon principals for the misdeeds of agents acting with apparent authority. See, *e. g., Dark* v. *United States,* 641 F. 2d 805 (CA9 1981) (federal tax liability); *National Acceptance Co.* v. *Coal Producers Assn.,* 604 F. 2d 540 (CA7 1979) (common-law fraud); *Holloway* v. *Howerdd,* 536 F. 2d 690 (CA6 1976) (federal securities fraud); *United States* v. *Sanchez,* 521 F. 2d 244 (CA5 1975) (bail bond fraud), cert. denied, 429 U. S. 817 (1976); *Kerbs* v. *Fall River Industries, Inc.,* 502 F. 2d 731 (CA10 1974) (federal securities fraud); *Gilmore* v. *Constitution Life Ins. Co.,* 502 F. 2d 1344 (CA10 1974) (common-law fraud).[6]

---

[6] The dissent delves into the agency law of the late 19th century and concludes that "it was far from clear" that a principal could be held liable for the deliberate torts of his agent. *Post,* at 587. But in fact, while there was a division of authority, many courts had made it very clear that principals could be held liable for torts analogous to the antitrust violations committed by ASME's agents.

For instance, a treatise of that era noted that a "considerable number of American courts" had held the principal liable for the agent's fraud, though the agent acted solely for his own benefit, and praised a leading opinion for its "singular ability and lucidity." E. Huffcut, Elements of the Law of Agency § 155, p. 168 (1895). Indeed, the author commented that the cases holding a principal liable when his agent acted with apparent authority and for the agent's sole benefit were "too various to be referred to in detail." *Id.*, § 157.

In holding a telegraph company liable for the fraud of its agent committed solely for his personal benefit, one court summarized the reasoning that became widespread during the last half of the 19th century: "Persons receiving dispatches in the usual course of business, when there is nothing to

In the past, the Court has refused to permit broad common-law barriers to relief to constrict the antitrust private right of action. *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134 (1968). It stated there that "the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat" to deter antitrust violations. *Id.*, at 139. In *Perma Life Mufflers*, the Court honored that purpose by denying defendants the right to invoke a common-law defense (the doctrine of *in pari delicto*) that was inconsistent with the antitrust laws. In this case, we can honor the statutory purpose best by interpreting the antitrust private cause of action to be at least as broad as a plaintiff's right to sue for analogous torts, absent indications that the antitrust laws are not intended to reach so far. See *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 639 (1981); *Perma Life*

---

excite suspicion, are entitled to rely upon the presumption that the agents intrusted with the performance of the business of the company have faithfully and honestly discharged the duty owed by it to its patrons, and that they would not knowingly send a false or forged message." *McCord* v. *Western Union Tel. Co.*, 39 Minn. 181, 185, 39 N. W. 315, 317 (1888). See, *e. g.*, *Bank of Batavia* v. *New York, L. E. & W. R. Co.*, 106 N. Y. 195, 12 N. E. 433 (1887).

Thus, based on the agency law of the late 19th century, there is ample support for holding ASME liable, particularly since Congress intended that the antitrust laws be given broad, remedial effect. See, *e. g.*, *Pfizer Inc.* v. *Government of India*, 434 U. S. 308, 312–313 (1978). But, as we have made clear before, Victorian common law does not define the limits of the antitrust private action. *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U. S. 134 (1968) (refusing to apply the ancient defense of *in pari delicto* in antitrust cases). We look to the general principles of the common law for guidance in deciding the scope of the antitrust cause of action, see *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 688 (1978), but our decisions are determined by the congressional intent that led to the enactment of the antitrust laws, a desire to enhance competition, see *id.*, at 688, 691. Here, general agency principles would lead to a finding of liability if the violation in this case were a mere tort; and imposing liability on ASME in accord with those common-law principles honors the congressional intent behind the antitrust statutes.

*Mufflers*, 392 U. S., at 138. Our remaining inquiry, then, is whether ASME's liability under a theory of apparent authority is consistent with the intent behind the antitrust laws.[7]

## B

We hold that the apparent authority theory is consistent with the congressional intent to encourage competition. ASME wields great power in the Nation's economy. Its codes and standards influence the policies of numerous States and cities, and, as has been said about "so-called voluntary standards" generally, its interpretations of its guidelines "may result in economic prosperity or economic failure, for a number of businesses of all sizes throughout the country," as well as entire segments of an industry. H. R. Rep. No. 1981, 90th Cong., 2d Sess., 75 (1968). ASME can be said to be "in reality an extra-governmental agency, which prescribes rules for the regulation and restraint of interstate commerce." *Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U. S. 457, 465 (1941). When it cloaks its subcommittee officials with the authority of its reputation,

---

[7] Evidently, in recent years no Court of Appeals other than the Second Circuit has directly decided whether a principal can be held liable for antitrust damages based on an apparent authority theory. But cf. *Truck Drivers' Local No. 421* v. *United States*, 128 F. 2d 227 (CA8 1942). The dissent cites several cases, stating that they appear to reject antitrust liability based on apparent authority. See *post*, at 581–582, and n. 6. *United States* v. *Cadillac Overall Supply Co.*, 568 F. 2d 1078, 1090 (CA5), cert. denied, 437 U. S. 903 (1978); *United States* v. *Hilton Hotels Corp.*, 467 F. 2d 1000, 1004–1007 (CA9 1972), cert. denied *sub nom. Western International Hotels Co.* v. *United States*, 409 U. S. 1125 (1973); *United States* v. *American Radiator & Standard Sanitary Corp.*, 433 F. 2d 174, 204 (CA3 1970), cert. denied, 401 U. S. 948 (1971). A fair reading of those cases, however, reveals that they did not discuss the merits of an apparent authority theory of antitrust liability. The dissent then dismisses other cases that also do not directly discuss the validity of the apparent authority theory, but that contain language approving apparent authority instructions, see *post*, at 583–584, n. 8. *United States* v. *Continental Group, Inc.*, 603 F. 2d 444, 468, n. 5 (CA3 1979), cert. denied, 444 U. S. 1032 (1980); *Continental Baking Co.* v. *United States*, 281 F. 2d 137, 150–151 (CA6 1960).

ASME permits those agents to affect the destinies of businesses and thus gives them the power to frustrate competition in the marketplace.

The facts of this case dramatically illustrate the power of ASME's agents to restrain competition. M&M instigated the submission of a single inquiry to an ASME subcommittee. For its efforts, M&M secured a mere "unofficial" response authored by a single ASME subcommittee chairman. Yet the force of ASME's reputation is so great that M&M was able to use that one "unofficial" response to injure seriously the business of a competitor.

Furthermore, a standard-setting organization like ASME can be rife with opportunities for anticompetitive activity. Many of ASME's officials are associated with members of the industries regulated by ASME's codes. Although, undoubtedly, most serve ASME without concern for the interests of their corporate employers, some may well view their positions with ASME, at least in part, as an opportunity to benefit their employers. When the great influence of ASME's reputation is placed at their disposal, the less altruistic of ASME's agents have an opportunity to harm their employers' competitors through manipulation of ASME's codes.[8]

Again, the facts of this case are illustrative. Hardin was able to issue an interpretation of ASME's Boiler and Pressure Vessel Code which in effect declared Hydrolevel's product unsafe. Hardin's interpretation of the code was sent out

---

[8] For example, James' employer did not overlook his usefulness as an ASME official. In November 1973, even after the Hydrolevel events had taken place, an M&M executive recommended that James be retained by M&M. The recommendation stated:

"A major reason for the continued success at M&M is a result of [James'] efforts and skill in influencing the various code making bodies to 'legislate' in favor of M&M products. This has been a planned strategy for the business under E. N. McDonnell and carried out with considerable success as evidenced by the M&M market penetration of 70 plus %." App. 86.

The writer emphasized a number of James' ASME activities, including: "Member of main boiler and pressure code committee" and "Chairman of the heating boiler sub-committee (section 4)." *Ibid.*

under Hoyt's name as secretary of the committee, though Hoyt exercised only ministerial duties and played no role in confirming the substance of the April 29, 1971, letter. See App. 125–126. Thus, without any meaningful safeguards,[9] ASME entrusted the interpretation of one of its codes to Hardin. As a result, M&M was able to use ASME's reputation to hinder Hydrolevel's competitive threat.

A principal purpose of the antitrust private cause of action, see 15 U. S. C. § 15, is, of course, to deter anticompetitive practices. *Pfizer Inc.* v. *Government of India,* 434 U. S. 308, 314 (1978); *Perma Life Mufflers, Inc.* v. *International Parts Corp.,* 392 U. S., at 139; see *Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 342–344 (1979). It is true that imposing liability on ASME's agents themselves will have some deterrent effect, because they will know that if they violate the antitrust laws through their participation in ASME, they risk the consequences of personal civil liability. But if, in addition, ASME is civilly liable for the antitrust violations of its agents acting with apparent authority, it is much more likely that similar antitrust violations will not occur in the future. "[P]ressure [will be] brought on [the organization] to see to it that [its] agents abide by the law." *United States* v. *A & P Trucking Co.,* 358 U. S. 121, 126 (1958). Only ASME can take systematic steps to make improper conduct on the part of all its agents unlikely, and the possibility of civil liability will inevitably be a powerful incentive for ASME to take those steps.[10] Thus, a rule that imposes liability on the

---

[9] ASME suggests that Hardin's response did undergo a form of committee review, because he sent copies to the chairman and vice chairman of the full committee. Brief for Petitioner 8. But there is no indication that those officers carefully scrutinized Hardin's response. And certainly they will be encouraged to give responses a closer look in the future if ASME is subject to antitrust liability under an apparent authority theory.

[10] Permitting private plaintiffs to sue defendants like ASME will make that incentive especially powerful, because private suits are an important element of the Nation's antitrust enforcement effort:

"Congress created the treble-damages remedy . . . precisely for the purpose of encouraging *private* challenges to antitrust violations. These pri-

standard-setting organization—which is best situated to prevent antitrust violations through the abuse of its reputation—is most faithful to the congressional intent that the private right of action deter antitrust violations.[11]

The wisdom of the apparent authority rule becomes evident when it is compared to the alternative approaches advanced by the District Court's instructions to the jury, see *supra*, at 564–565, and advocated by ASME.[12]  First, ASME insists that it should not be held liable unless it ratified the actions of its agents.  But a ratification rule would have anticompetitive effects, directly contrary to the purposes of the antitrust laws.  ASME could avoid liability by ensuring that it remained ignorant of its agents' conduct, and the antitrust laws would therefore encourage ASME to do as little as possible to oversee its agents.  Thus, ASME's ratification theory would actually enhance the likelihood that the Society's reputation would be used for anticompetitive ends.

Second, ASME contends that it should not be held liable unless its agents act with an intent to benefit the Society. This proposed rule falls short, though, because it is simply irrelevant to the purposes of the antitrust laws.  Whether

---

vate suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations."  *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 344 (1979) (emphasis in original).

[11] The apparent authority rule is also consistent with the congressional desire that the antitrust laws sweep broadly.  Congress extended antitrust liability to "[e]very person," 15 U. S. C. §§ 1, 2, and defined "person" to include corporations and associations, 15 U. S. C. § 7.

[12] ASME insists that the Court foreclosed imposition of civil antitrust liability based on apparent authority in *Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344 (1922), and *Coronado Coal Co.* v. *Mine Workers*, 268 U. S. 295 (1925).  Those cases, however, are not controlling here.  The Court expressly pointed out: "Here it is not a question . . . of holding out an appearance of authority on which some third person acts."  259 U. S., at 395; 268 U. S., at 304–305.  In fact, it noted: "A corporation is responsible for the wrongs committed by its agents in the course of its business, and this principle is enforced against the contention that torts are *ultra vires* of the corporation."  259 U. S., at 395; 268 U. S., at 304.

they intend to benefit ASME or not, ASME's agents exercise economic power because they act with the force of the Society's reputation behind them. And, whether they act in part to benefit ASME or solely to benefit themselves or their employers, ASME's agents can have the same anticompetitive effects on the marketplace. The anticompetitive practices of ASME's agents are repugnant to the antitrust laws even if the agents act without any intent to aid ASME, and ASME should be encouraged to eliminate the anticompetitive practices of all its agents acting with apparent authority, especially those who use their positions in ASME solely for their own benefit or the benefit of their employers.[13]

## C

Finally, ASME makes two additional arguments in an attempt to avoid antitrust liability. It characterizes treble damages for antitrust violations as punitive, and urges that

---

[13] The dissent argues, unconvincingly to us, that imposing antitrust liability on ASME will not advance enforcement of the antitrust laws.

The dissent claims that the apparent authority rule will "encourag[e] plaintiffs to seek recovery from nonprofit organizations, rather than from the commercial enterprises that benefited from the violation." *Post*, at 591. Here, the dissent engages in "curious reasoning," see *ibid.*, because today's decision does not encourage a plaintiff to sue any particular defendant to the exclusion of others; it merely lists organizations like ASME among the possible defendants in cases similar to this one. Indeed, although the litigation in this case ended with ASME as the only remaining defendant, it seems likely that, in general, a plaintiff will prefer to bring a corporate defendant like M&M (ITT) before a jury, rather than a nonprofit organization that understandably may appeal to a jury's sympathies and that may not provide so deep a pocket as a commercial enterprise.

In addition, the dissent insists that ASME and other such organizations cannot take steps to reduce the likelihood that antitrust violations like the one that occurred in this case will take place in the future. *Post*, at 591–592, n. 17. Evidently ASME does not agree, because it has instituted new procedures specifically in response to this suit. See n. 15, *infra*. The dissent simply refuses to accept that ASME and other such organizations can react to potential antitrust liability by making their associations less subject to fraudulent manipulation.

under traditional agency law the courts do not employ apparent authority to impose punitive damages upon a principal for the acts of its agents. See *Lake Shore & M. S. R. Co.* v. *Prentice*, 147 U. S. 101 (1893); *United States* v. *Ridglea State Bank*, 357 F. 2d 495 (CA5 1966); see also Restatement § 217C.[14] It is true that antitrust treble damages were designed in part to punish past violations of the antitrust laws. See *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S., at 639. But treble damages were also designed to deter future antitrust violations. *Ibid.* Moreover, the antitrust private action was created primarily as a remedy for the victims of antitrust violations. *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 485–486 (1977); see *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 746–747 (1977). Treble damages "make the remedy meaningful by counterbalancing 'the difficulty of maintaining a private suit'" under the antitrust laws. *Brunswick Corp., supra,* at 486, n. 10, quoting 21 Cong. Rec. 2456 (1890) (remarks of Sen. Sherman). Since treble damages serve as a means of deterring

---

[14] A majority of courts, however, have held corporations liable for punitive damages imposed because of the acts of their agents, in the absence of approval or ratification. See W. Prosser, Law of Torts 12 (4th ed. 1971). *E. g., Kelite Products, Inc.* v. *Binzel*, 224 F. 2d 131, 144 (CA5 1955) ("[T]he jury may in its discretion assess punitive damages against a corporate defendant for oppressive acts of its agent done in the course of his employment, regardless of actual authority or ratification"); *Mayo Hotel Co.* v. *Danciger*, 143 Okla. 196, 200, 288 P. 309, 313 (1930) (holding corporate principal liable for punitive damages, noting that "the legal malice of the servant is the legal malice of the corporation"). In fact, the Court may have departed from the trend of late 19th-century decisions when it issued *Lake Shore & M. S. R. Co.* v. *Prentice*, 147 U. S. 101 (1893), requiring the principal's participation, approval, or ratification. See *Singer Manufacturing Co.* v. *Holdfodt*, 86 Ill. 455, 459 (1877) ("if the wrongful act of the agent is perpetrated while ostensibly discharging duties within the scope of the corporate purposes, the corporation may be liable to vindictive damages"); see also *Pullman Palace Car Co.* v. *Lawrence*, 74 Miss. 782, 803–805, 22 So. 53, 57–59 (1897); *Goddard* v. *Grand Trunk R. Co.*, 57 Me. 202, 223–224 (1869).

antitrust violations and of compensating victims, it is in accord with both the purposes of the antitrust laws and principles of agency law to hold ASME liable for the acts of agents committed with apparent authority. See Restatement § 217C, Comment *c*, p. 474 (rule limiting principal's liability for punitive damages does not apply to special statutes giving triple damages).

In addition, ASME contends it should not bear the risk of loss for antitrust violations committed by its agents acting with apparent authority because it is a nonprofit organization, not a business seeking profit. But it is beyond debate that nonprofit organizations can be held liable under the antitrust laws. See, *e. g.*, *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.*, 364 U. S. 656 (1961); *Associated Press* v. *United States*, 326 U. S. 1 (1945). Although ASME may not operate for profit, it does derive benefits from its codes, including the fees the Society receives for its code-related publications and services, the prestige the codes bring to the Society, the influence they permit ASME to wield, and the aid the standards provide the profession of mechanical engineering. Since the antitrust violation in this case could not have occurred without ASME's codes and ASME's method of administering them, it is not unfitting that ASME be liable for the damages arising from that violation. See W. Prosser, Law of Torts 459 (4th ed. 1971); W. Seavey, Law of Agency § 83 (1964). Furthermore, as shown above, ASME is in the best position to take precautions that will prevent future antitrust violations.[15] Thus, the fact that ASME is a nonprofit organization does not weaken the force of the antitrust and agency principles that indicate that ASME should be liable for Hydrolevel's antitrust injuries.

---

[15] Indeed, ASME has initiated procedures to protect against similar misadventures in the future. After its experience with the Hydrolevel affair, ASME began issuing a publication containing all written technical inquiries pertaining to codes and their interpretations, a publication available through subscription. See ASME Court of Appeals Exhibit Volume,

## III

We need not delineate today the outer boundaries of the antitrust liability of standard-setting organizations for the actions of their agents committed with apparent authority. There is no doubt here that Hardin acted within his apparent authority when he answered an inquiry about ASME's Boiler and Pressure Vessel Code as the chairman of the relevant ASME subcommittee. And in this case, we do not face a challenge to a good-faith interpretation of an ASME code reasonably supported by health or safety considerations. See *Silver* v. *New York Stock Exchange*, 373 U. S. 341 (1963). We have no difficulty in finding that this set of facts falls well within the scope of ASME's liability on an apparent authority theory.

When ASME's agents act in its name, they are able to affect the lives of large numbers of people and the competitive fortunes of businesses throughout the country. By holding ASME liable under the antitrust laws for the antitrust violations of its agents committed with apparent authority, we recognize the important role of ASME and its agents in the economy, and we help to ensure that standard-setting organizations will act with care when they permit their agents to

---

p. 110; App. in Nos. 79–7254, 79–7260 (CA2), pp. 784 and 804. Apparently, ASME now gives its interpretations close scrutiny through the publication process. According to the publication's foreword, "[i]n some few instances, a review of the interpretation revealed a need for corrections of a technical nature." In those cases, ASME published "a corrected interpretation . . . immediately after the original reply." See Interpretations, ASME Boiler and Pressure Vessel Code, Foreword (No. 7: Replies to Technical Inquiries January 1, 1980, through June 30, 1980). In addition, the readers are advised that ASME may reconsider its interpretation "when or if additional information is available which the inquirer believes might affect the interpretation." *Ibid.*

ASME's new procedure illustrates that the standard-setting organization itself is in the best position to prevent antitrust violations committed by its agents acting with apparent authority, and therefore that the policies of antitrust and agency law call for imposition of liability upon ASME.

speak for them. We thus make it less likely that competitive challengers like Hydrolevel will be hindered by agents of organizations like ASME in the future.

The judgment of the Court of Appeals is affirmed.

*So ordered.*

CHIEF JUSTICE BURGER, concurring in the judgment.

I concur in the judgment. However, I do not agree with the reasoning that leads the Court to its conclusion. I agree with the result reached since petitioner permitted itself to be used to further the scheme which caused injury to respondent. At no time did petitioner disavow the challenged conduct of its members who misused their positions in the Society. Under the instructions approved by petitioner and given by the District Court, the jury found that petitioner had "ratified or adopted" the conduct in question.* On that basis the judgment against petitioner should be affirmed but no general rule can appropriately be drawn from the Court's holding.

JUSTICE POWELL, with whom JUSTICE WHITE and JUSTICE REHNQUIST join, dissenting.

The Court today adopts an unprecedented theory of antitrust liability, one applied specifically to a nonprofit, standard-setting association but a theory with undefined boundaries that could encompass a broad spectrum of our country's nonprofit associations. The theory, based on the agency concept of "apparent authority," would impose the poten-

---

*The District Court instructed the jury that it could find petitioner liable for the acts of its members only if they acted on behalf of the corporation within the scope of their actual authority or if the corporation thereafter ratified or adopted their acts. Judge Weinstein refused to give the apparent authority instruction proposed by respondent. Nevertheless, the Court of Appeals did not rest on the narrow ratification theory underlying the District Court judgment, but instead reached out to decide that petitioner is liable for the acts of its members if those acts are found to be within their apparent authority: the jury never found liability on that the-

tially crippling burden of treble damages. In this case, the Court specifically holds that standard-setting organizations may be held liable for the acts of their agents even though the organization never ratified, authorized, or derived any benefit whatsoever from the fraudulent activity of the agent and even though the agent acted solely for his private employer's gain. In my view such an expansive rule of strict liability, at least as applied to nonprofit organizations, is inconsistent with the weight of precedent and the intent of Congress, unsupported by the rules of agency law that the Court purports to apply, and irrelevant to the achievement of the goals of the antitrust laws. Accordingly, I dissent.

## I

The American Society of Mechanical Engineers (ASME) is a nonprofit, tax-exempt, membership corporation with over 90,000 members. Among its many activities, ASME drafts over 400 codes and standards. These codes have been developed through the voluntary efforts of ASME's members, and are a valuable public service. The Boiler and Pressure Vessel Code, relevant in this case, is some 18,000 pages in length. In addition to preparing codes and standards, ASME members—through committees—perform the further service of responding to public inquiries concerning interpretation of the codes. Some measure of the extent of this service can be gathered from the 20,000–30,000 inquiries a year received by the organization concerning just the Boiler and Pressure Vessel Code alone. As a result of a fraudulent answer given by an ASME subcommittee chairman to one of these thousands of inquiries, the entire organization has been exposed to potentially crippling liability.[1]

---

ory and the Court of Appeals went "out of bounds." I regard that aspect of the Court of Appeals' opinion and that part of the Court's opinion today as dictum not essential to support the result reached.

[1] The District Court entered a judgment against ASME in an amount in excess of $7 million—a sum that would destroy many such organizations. By contrast McDonnell & Miller, Inc., and Hartford Steam Boiler Inspec-

Of course, nonprofit associations are subject to the antitrust laws. The Court has so held on several occasions. See *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773 (1975).[2] Yet the Court also has noted that the antitrust laws need not be applied to professional organizations in precisely the same manner as they are applied to commercial enterprises. In *Goldfarb, supra,* for example, the Court recognized that "[i]t would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts that originated in other areas."[3] *Id.,* at 788, n. 17. In view of this recognition, one would not have expected the Court to take

tion and Insurance Co., commercial enterprises owned by International Telephone and Telegraph Corp., and the beneficiaries of the fraudulent conduct in this case, have settled for $725,000 and $75,000 respectively. Curiously, the Court speaks of the "wisdom" of a rule that encourages such an inequitable result. *Ante,* at 573. The Court correctly notes that the Court of Appeals reversed the damages award against ASME and remanded for a new estimation. Perhaps the final award against ASME will be substantially less than the $7.5 million judgment originally entered. Yet there is *no assurance of this.*

[2] Although associations now are viewed as being within the scope of the antitrust laws, to my knowledge this is the first case in which the Court has held explicitly that a nonprofit, tax-exempt association is subject to treble-damages liability. Cf. Areeda, Antitrust Immunity for "State Action" After *Lafayette,* 95 Harv. L. Rev. 435, 455 (1981) (footnote omitted) ("[A]ntitrust liability does not necessarily call for a damage remedy. . . . The Supreme Court may come to agree that antitrust liability may vary according to the remedies sought").

ASME refers to itself as a "society." I use the words "organization" and "association" interchangeably to describe a broad range of nonprofit, membership entities and tax-exempt organizations.

[3] *Goldfarb* "properly left to the Court some flexibility in considering how to apply traditional Sherman Act concepts to professions long consigned to self-regulation." *National Society of Professional Engineers* v. *United States,* 435 U. S. 679, 699 (1978) (BLACKMUN, J., concurring in part and concurring in judgment). See *id.,* at 701 (stressing the need for "elbow-room for realistic application of the Sherman Act" to other than commercial enterprises).

the occasion of this case to promulgate an expansive rule of antitrust liability not heretofore applied by it to a commercial enterprise much less to a nonprofit organization.

Indeed, the Court points to no case in which any court has held the apparent authority theory of liability applicable in an antitrust case. Nor does the Court cite a single decision in which the apparent authority theory of liability has been applied in a case involving treble or punitive damages and an agent who acts without any intention of benefiting the principal.[4] In a word, the Court makes *new* law, largely ignoring existing precedent.

In *Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344 (1922), and *Coronado Coal Co.* v. *Mine Workers*, 268 U. S. 295 (1925), the Court held that the national union was not liable as principal for the antitrust violations of the local union. The Court was hesitant to impose treble-damages liability on a membership organization in the absence of clear evidence showing ratification or authorization.[5] Even in the context

---

[4] The Court cites to several decisions, *ante*, at 575, n. 14, in which courts have levied punitive damages upon the principal for the "unauthorized" acts of an agent. It is not clear that *any* of these decisions holds the principal liable upon the apparent authority of an agent acting without intent to benefit the principal. None of them concerns the antitrust laws. None involves a nonprofit entity.

[5] "[A] trades-union . . . might be held liable . . . but certainly it must be clearly shown in order to impose such a liability on an association of 450,000 men that what was done was done by their agents in accordance with their fundamental agreement of association." *Coronado Coal Co.*, 268 U. S., at 304. The Court refused to impose liability on the national union simply because it had the authority to discipline the local. See *Mine Workers*, 259 U. S., at 395. Moreover, the Court indicated that this was not a case in which a theory of apparent authority might be applied—despite the national union's power over the local and despite the support of the strike by the president of the national union: "Here it is not a question of contract or of holding out an appearance of authority on which some third person acts." *Ibid.* The majority quotes this language, see *ante*, at 573, n. 12, but misses its point. The *Mine Workers* Court well could have characterized the case before it as involving an exercise of apparent authority by the local

of commercial enterprises, the Courts of Appeals that have considered the matter appear to reject antitrust liability upon mere apparent authority.[6]

Moreover, the Court as much as concedes that an apparent authority rule of liability has rarely, if ever, been used to impose punitive damages upon the principal. See *ante,* at 570, n. 7.[7] Rather than contest this well-established rule of

---

union or the national president; it refused to do so. See *Truck Drivers' Local No. 421* v. *United States,* 128 F. 2d 227, 235 (CA8 1942) (viewing the holding in *Mine Workers* as rejecting an apparent authority theory of antitrust liability).

[6] See *United States* v. *American Radiator & Standard Sanitary Corp.,* 433 F. 2d 174, 204 (CA3 1970); *United States* v. *Cadillac Overall Supply Co.,* 568 F. 2d 1078, 1090 (CA5 1978); *United States* v. *Hilton Hotels Corp.,* 467 F. 2d 1000 (CA9 1972). Accord *Truck Drivers' Local No. 421* v. *United States, supra,* at 235 (union not liable for the antitrust violations of a local division: "To bind the union in a situation such as this, actual and authorized agency was necessary; mere apparent authority would not be sufficient").

In *United States* v. *Hilton Hotels Corp., supra,* for example, the Court of Appeals for the Ninth Circuit ruled out liability on apparent authority by requiring that the agent hold a "purpose to benefit the corporation." *Id.,* at 1006, n. 4. In light of the rule adopted by the Court today, it is ironic that the Court of Appeals in *Hilton Hotels* considered that its rule of liability was actually a broad one. Although implicitly rejecting a rule of apparent authority, the court held that a corporation could be liable for the acts of its agents "even when done against company orders." *Id.,* at 1004. The court argued that such an expansive rule of liability was justified in the case before it, involving a commercial enterprise, because the Sherman Act was "primarily concerned with the activities of business entities." *Ibid.* A rule promoting corporate liability was supported further by the consideration that antitrust violations "are usually motivated by a desire to enhance profits," "involve basic policy decisions, and must be implemented over an extended period of time," and "if a violation of the Sherman Act occurs, the corporation, and not the individual agents, will have realized the profits from the illegal activity." *Id.,* at 1006. None of these considerations in support of a broad rule of liability applies to the fraudulent, self-interested conduct of ASME members in this case. Yet the Court adopts a rule of liability far broader than that stated by the Ninth Circuit with such care.

[7] In *Lake Shore & M. S. R. Co.* v. *Prentice,* 147 U. S. 101, 107 (1893), the Court held that "[a] principal . . . cannot be held liable for exemplary or punitive damages, merely by reason of wanton, oppressive or malicious in-

agency law, the Court argues that treble damages are not punitive or, even if they are, the purposes of the antitrust laws override this basic rule of the law of agency. In fact the Court often has characterized treble-damages liability as punitive: "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct." *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 639 (1981). See P. Areeda & D. Turner, Antitrust Law ¶311b (1978) ("whether or not compensatory damages ever punish, treble damages are indisputably punishment"). In the context of a nonprofit, tax-exempt organization it would seem even clearer that treble damages primarily punish and are intended to do so. There is no element of restitution here; ASME has derived no ill-gotten gain from the misdeeds of its disloyal agent.

In short, the Court launches on an uncharted course. I know of no antitrust decision that has imposed treble-damages liability upon a commercial enterprise, let alone a nonprofit organization, solely on an apparent authority theory of liability.[8] The antitrust laws have been effectively enforced for over 90 years without the need for such a theory of liability. Indeed, the very facts of this case belie the neces-

---

tent on the part of the agent." In a generally similar context, the Court of Appeals for the Fifth Circuit held that a principal was not subject to double damages under the False Claims Act, 31 U. S. C. § 231, for the fraud of an agent acting without intent to benefit the principal. See *United States* v. *Ridglea State Bank*, 357 F. 2d 495, 500 (1966) ("[T]he present action is not primarily one for the recovery of a loss caused by an employee, but is one which, if successful, must result in a recovery wholly out of proportion to actual loss. . . . [T]he case calls for the application of the rule . . . that the knowledge or guilty intent of an agent not acting with a purpose to benefit his employer, will not be imputed to the employer").

[8] Hydrolevel argues that *Continental Baking Co.* v. *United States*, 281 F. 2d 137, 150–151 (CA6 1960), and *United States* v. *Continental Group, Inc.*, 603 F. 2d 444, 468, n. 5 (CA3 1979), support an apparent authority theory of liability in antitrust cases. Yet in *Continental Baking* the court endorsed an instruction that included an "apparent" authority component on the theory that a corporation must "answer for [an agent's] violations of law which inure to the corporation's benefit." There was no such benefit

sity of simply *creating* a new theory of liability; the jury found ASME liable not upon a theory of apparent authority but upon the traditional basis of ratification or authorization. The apparent authority rationale was not even argued to the Second Circuit on appeal. The Second Circuit, and now this Court, reach out unnecessarily to embrace a dubious new doctrine. That the Court chooses the case of a nonprofit, tax-exempt organization to announce its new rule is particularly inappropriate. Nor can the Court's decision be squared with the intent of Congress in enacting the Sherman Act.

## II

This case comes before us as an antitrust suit under the Sherman Act. Our focus should be on the intent of Congress.[9] See *Texas Industries, Inc.* v. *Radcliff Materials, Inc., supra,* at 639. And that intent emerges clearly from the legislative history:

---

in this case. Moreover, in *Continental Group* the court simply affirmed an apparent authority instruction without comment, in a footnote, in a case presenting many other issues. The agents in that case were clearly acting for the benefit of their corporations, and the court may have considered that the apparent authority instruction, if error, was harmless.

In any event, the comparative paucity of authority on the question of apparent authority liability in antitrust cases simply underscores that the Court today is making new law. It also is doing so needlessly as ASME was neither tried nor found liable on the basis of apparent authority.

[9] Relying on a novel public policy as to nonprofit associations, the Court makes little effort to ascertain the intent of Congress either through examining the legislative history or the common law then existing. Indeed, the Court implies that the agency law of the 19th century and "Victorian" common law are irrelevant. See *ante,* at 568–569, n. 6. In seeking to understand the Sherman Act, this Court frequently has found it necessary to "delve" into the history of the common law both "Victorian" and from earlier eras. See *Standard Oil Co.* v. *United States,* 221 U. S. 1, 51–62 (1911). The Civil Rights Acts of the 19th century were also the work of a "Victorian" Congress, yet we have looked both to the legislative history and to the common law when interpreting those Acts. See, *e. g., Pierson* v. *Ray,* 386 U. S. 547 (1967).

"[The Sherman Act] was enacted in the era of 'trusts' and of 'combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern. The end sought was the prevention of restraints to free competition in business and commercial transactions which tended to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services . . . ." *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 492–493 (1940).

Senator Sherman twice explained that his bill was directed at anticompetitive *business* activity and not at voluntary associations. In response to a request that the legislation be more clearly tailored to "these great trusts, these great corporations, these large moneyed institutions," Senator Sherman answered as follows:

"The bill as reported contains three or four simple propositions which relate only to contracts, combinations, agreements made with a view and designed to carry out a certain purpose . . . . It does not interfere in the slightest degree with voluntary associations . . . to advance the interests of a particular trade or occupation. . . . They are not business combinations. They do not deal with contracts, agreements, etc. They have no connection with them." 21 Cong. Rec. 2562 (1890).

When Senator Hoar expressed the concern that the bill would prohibit temperance organizations, and proposed an amendment to exclude them from the bill, Senator Sherman spoke reassuringly:

"I have no objection to [this] amendment, but I do not see any reason for putting in temperance societies any more than churches or school-houses or any other kind of

moral or educational associations that may be organized. Such an association is not in any sense a combination or arrangement made to interfere with interstate commerce." *Id.*, at 2658.

This legislative history does not indicate that nonprofit associations are exempt from the antitrust laws. See *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975). But it does counsel against adopting a new rule of agency law that extends the exposure of such organizations to potentially destructive treble-damages liability.

In addition to the legislative history, it is particularly relevant—in view of the Court's reliance on the modern law of agency—to consider the accepted law of agency as it existed at the time the Sherman Act was passed.[10] It was clear under basic principles then established that charitable organizations were not liable for the torts of their agents.[11]

---

[10] In *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 644, n. 17 (1981), the Court stated that the rules of common law in effect at the time the Act was passed were relevant to an inquiry into congressional intent: "[I]t is clear that when the Sherman Act was adopted the common law did not provide a right to contribution among tortfeasors participating in proscribed conduct. One permissible, though not mandatory, inference is that Congress relied on courts' continuing to apply principles in effect at the time of enactment." The contemporary case law is relevant precisely because "Congress . . . did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition." *National Society of Professional Engineers* v. *United States*, 435 U. S., at 688.

[11] "Where a corporation or trustees are conducting a charity with funds devoted to that purpose, the charitable organization is not liable for the torts of its agents or servants, as 'it would be against all law and all equity to take those trust funds, so contributed for a special, charitable purpose, to compensate injuries inflicted or occasioned by the negligence of the agents or servants.'" E. Huffcut, Elements of the Law of Agency § 161, pp. 176–177 (1895).

Whether a nonprofit, tax-exempt, public service association would have been considered a "charity" is not clear, but one would think that it well might have been.[12]

Moreover, under the laws of agency as known to the Congress that passed the Sherman Act it was far from clear—even in cases involving commercial enterprises—that a principal could be held liable for the deliberate torts of his agent. According to one treatise of the time, "[w]hile . . . it is well settled that the principal is liable for the negligent act of his agent, committed in the course of his employment, it has been held in many cases, that he is not liable for the agent's willful or malicious act." F. Mechem, Law of Agency § 740 (1889) (hereafter Mechem).[13] Indeed, the Court acknowl-

---

[12] In describing the liability of the principal for the torts of the agent, the First Restatement of Agency, published in 1933, cautioned that it did not address "any limitations upon liability because of . . . rules applicable to special classes, such as charitable organizations." Restatement of Agency 458.

[13] The complete statement of the rule by Mechem is as follows:

"While . . . it is well settled that the principal is liable for the negligent act of his agent, committed in the course of his employment, it has been held in many cases, that he is not liable for the agent's willful or malicious act. . . .

"The tendency of modern cases, however, is to attach less importance to the intention of the agent and more to the question whether the act was done within the scope of the agent's employment; and it is believed that the true rule may be said to be that the principal is responsible for the wilful or malicious acts of his agent, if they are done in the course of his employment and within the scope of his authority; *but that the principal is not liable for such acts, unless previously expressly authorized, or subsequently ratified, when they are done outside of the course of the agent's employment, and beyond the scope of his authority, as where the agent steps aside from his employment to gratify some personal animosity, or to give vent to some private feeling of his own*" (emphasis added, footnotes omitted).

Although the concept of within "scope of authority" is not always easy to apply, it is beyond rational doubt that in this case the fraudulent activity of Hardin and James, on behalf of McDonnell & Miller, Inc., was not within the scope of any authority of ASME. In addition, some courts have found that "[a] purpose to benefit the corporation is necessary to bring the

edges this much when it notes that in *Friedlander* v. *Texas & Pacific R. Co.*, 130 U. S. 416 (1889)—decided the year before the Sherman Act was passed—"the Court held that an employer was not liable for the fraud of his agent, when the employer could derive no benefit from the agent's fraud." *Ante*, at 567.[14]

Finally, no principle of agency law was more firmly established in 1890—or now for that matter—than that *punitive* damages are not awarded against a principal for the acts of an agent acting only with apparent authority and without any intention of benefiting the principal. Indeed, this Court

---

agent's acts within the scope of his employment." See *United States* v. *Hilton Hotels Corp.*, 467 F. 2d, at 1006, n. 4. It is just such a purpose that was lacking in this case. Indeed, the "agents" in this case were not acting simply for their own malicious purposes, they were acting on behalf of another principal with interests inimical to those of ASME. It is far from clear under principles of agency law that Hardin and James are properly described as the "agents" of ASME when they act to serve a different principal and without any intention of benefiting ASME. See Mechem § 67 ("A person may act as agent of two or more principals . . . if his duties to each are not such as to require . . . incompatible things").

The Court suggests that there was a division among the state courts on the question of the principal's liability for the malicious acts of an agent. See *ante*, at 568–569, n. 6. But there was no division in the federal courts, the courts charged with enforcement of the Sherman Act. In any event, surely the point is not whether every state court recognized the rule stated by this Court in *Friedlander* v. *Texas & Pacific R. Co.*, 130 U. S. 416 (1889). Rather, if there was any uncertainty as to the liability of a commercial principal for the torts of an agent acting in the course of employment, how much clearer must it be that a nonprofit, voluntary association would not have been held liable in treble damages for the acts of an agent acting with apparent authority only.

[14] The Court notes that *Friedlander* was later overruled by *Gleason* v. *Seaboard Air Line R. Co.*, 278 U. S. 349 (1929). The relevance of this fact to *Congress'* intentions is not clear to me. There is "no federal general common law." *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 78 (1938). There is no federal general law of agency. Rather we are engaged here in an exercise in statutory construction. Cf. 21 Cong. Rec. 3149 (1890) (remarks of Sen. Morgan) ("It is very true that we use common-law terms

went further, holding more generally that "'punitive or vindictive damages, or smart money, [are] not to be allowed as against the principal, unless the principal participated in the wrongful act of the agent.'" *Lake Shore & M. S. R. Co.* v. *Prentice*, 147 U. S., at 114, quoting *Hagan* v. *Providence & Worcester R. Co.*, 3 R. I. 88, 91 (1854).[15]

Although an inquiry into the legislative history and the law of agency is not conclusive, it does cast serious doubt on the Court's choice of this case to promulgate a new rule of antitrust liability. Whatever the merits of an apparent authority rule of liability for commercial enterprises, in the case of a treble-damages action against a nonprofit organization, such a rule is inconsistent with what appears to have been the intent of Congress in enacting the Sherman Act.

---

here and common-law definitions in order to define an offense which is in itself comparatively new, but it is not a common-law jurisdiction that we are conferring upon the circuit courts of the United States," quoted in *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S., at 644).

[15] The Court responds by citing to several *state* law decisions indicating that in some States a principal might have been held liable in punitive damages for the acts of an agent. See *ante*, at 575, n. 14. I believe the Court overstates the extent to which 19th-century state courts imposed punitive damages on the principal for the deliberate torts of an agent. See Mechem § 751; cf. *Mayo Hotel Co.* v. *Danciger*, 143 Okla. 196, 200, 288 P. 309, 312 (1930) ("There are . . . respectable authorities, some of them recent ones, definitely holding that a corporation cannot be subjected to exemplary damages because of the malicious . . . acts of its agents and servants where such acts are not authorized or afterwards ratified . . . . Many of the state courts, *and a majority of the federal courts*, expressly adhere to that doctrine") (emphasis added). More significantly, the Court does not make clear which, if any, of the state decisions it relies upon held the principal liable for punitive damages upon the apparent authority of an agent acting without any intention of benefiting the principal. I had thought that this was the question before us. And again the Court misses the basic point: If the rule of liability adopted by the Court today would have seemed questionable in 1890 even as applied to a commercial enterprise, can there be any basis for believing that Congress intended such an extreme rule of liability to be applied to voluntary, nonprofit associations?

## III

The underlying theme of the Court's opinion seems to be that any rule of agency law that widens the net of antitrust enforcement and liability should be adopted. Yet the Court has never used such a single-minded approach in the past. In *United States* v. *United States Gypsum Co.*, 438 U. S. 422 (1978), for example, the Court held that intent is a necessary element of a criminal antitrust offense. The Court was unwilling to assume that Congress had intended to create a strict liability crime despite the potential increase in deterrence. Similarly, in *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720 (1977), the Court held that indirect purchasers could not use a "pass-on" theory to recover treble damages from an antitrust violator. The Court rejected the argument that the antitrust laws would be more effective were the class of potential plaintiffs widened. On the contrary, "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue." *Id.*, at 735. Nor would the Court accept a rule that might permit both indirect and direct purchasers to sue for the same overcharge. Such a rule "would create a serious risk of multiple liability for defendants." *Id.*, at 730. Thus, the Court has adopted a more discerning approach to questions of antitrust liability in the past—an approach that considers the fairness and appropriateness of a rule in addition to its perceived potential for deterrence.

The Court argues that its expanded rule of liability furthers effective antitrust enforcement. One may question whether a rule of liability developed so late in the day and with so little support in precedent can be described as necessary to antitrust enforcement. When one considers further that the jury found ASME liable under traditional principles, the need for an expanded rule becomes even less credible. Nor does the Court explain how its rule of apparent authority serves the purpose of effective antitrust enforcement. The

primary beneficiary in this case was McDonnell & Miller, the manufacturing company that arranged for the fraudulent ruling by the ASME subcommittee chairman. The sole purpose of the fraud was to disadvantage McDonnell & Miller's competitor. The focus of Hydrolevel's attack, however, has been on ASME.[16] It is curious reasoning to argue, as the Court does, that a rule that encourages plaintiffs to seek recovery from nonprofit organizations, rather than from the commercial enterprises that benefited from the violation, will facilitate proper antitrust enforcement.[17]

---

[16] Damages were awarded against ASME in an amount of $7.5 million. By contrast, McDonnell & Miller settled the suit for less than a million dollars. See n. 1, *supra*. The majority's contention that "a plaintiff will prefer to bring a corporate defendant like M&M (ITT) before a jury," *ante*, at 574, n. 13, is not borne out by this case. If the Court has some other case in mind, it does not cite to it.

[17] The Court's argument that the imposition of treble damages will advance antitrust enforcement has a hollow ring in the context of a membership, nonprofit organization. Organizations of this kind normally function through committees composed—as in this case—of volunteers who are not employees, serve only at infrequent intervals, and are virtually uncontrollable by what usually is a small headquarters staff.

The Court suggests that voluntary organizations can "take steps to reduce the likelihood that antitrust violations like the one that occurred in this case will take place in the future." *Ibid.* The Court then refers to "new procedures" adopted by ASME, and criticizes my dissent for refusing "to accept that ASME and other such organizations can react to potential antitrust liability by making their associations less subject to fraudulent manipulation." *Ibid.*

It would be enlightening if the Court would explain how such an association can protect itself even from "mere tort" liability, see *ante*, at 569, n. 6, much less the treble-damages liability imposed in this case, in light of the Court's adoption of the apparent authority theory of liability. Review procedures well may be helpful to prevent mistakes made in good faith on behalf of an association. But no set of rules and regulations, and no procedures however elaborate, can protect adequately against fraud and disloyalty. In this case, for example, if ASME had required approval by a review committee or even by its governing body before the release of each of the thousands of ruling letters, a member bent on fraud could forge evidence or otherwise circumvent most safeguards. In practice, a rule of ap-

In a more fundamental sense, the Court's assignment of liability to ASME on a theory of apparent authority simply has no relevance to the furtherance of the purposes of the antitrust laws. ASME is not a competitor. The competition here was between McDonnell & Miller, Inc., and Hydrolevel. Of course, if ASME ratifies the fraudulent act of its agent, as the jury found, liability should attach. But the Court has devised what amounts to a rule of strict liability for voluntary associations in antitrust cases. Under the Court's rule ASME would be liable if an ASME building employee pilfered ASME stationery and supplied it to McDonnell & Miller. Similarly, if a private pharmaceutical school—a tax-exempt corporation like ASME—released a study condemning a particular drug, because a competing drug company had suborned the professor who wrote the report, the Court's rule would subject the school to the full brunt of treble damages.

Section 1 of the Sherman Act requires a contract, combination, or conspiracy in restraint of trade. The Court attaches liability in this case on the dubious notion that ASME somehow has "conspired" with McDonnell & Miller. Yet it stretches the concept of vicarious liability beyond its rational limits to conceive of Hardin and James as conspiring on behalf of ASME when they acted solely for the benefit of McDonnell & Miller and against the interests of ASME.[18] The Court simply opens new vistas in the law of conspiracy and vicarious liability, as well as in the imposition of the harsh penalty of treble damages.

---

parent authority can be a rule of strict liability as the Court today holds in this case. In the context of a loosely structured, voluntary nonprofit association it may be wholly impractical to adopt any measures that will lessen substantially the likelihood of liability, and if there is liability the Court also would impose punitive damages.

[18] The intersection of the law of agency and vicarious liability with the law of conspiracy makes this a complex case. Yet the Court does not recognize this complexity. It so expands the concept of vicarious liability as to leave little content, in this case, to the requirement in § 1 of the Sherman

Whatever the application of agency law in its traditional setting, application of the most expansive rules of liability in the context of antitrust treble damages and nonprofit, tax-exempt associations threatens serious injustice and overdeterrence. There is no way in which an association adequately can protect itself from this sort of liability. There is no chain of delegated authority, from stockholders through directors and officers, in the typical voluntary association. The members of these associations exercise a far less structured control than the stockholders and directors of a commercial enterprise. Perhaps ASME will attempt to protect itself by ceasing to respond to inquiries concerning its codes. That hardly would contribute either to antitrust enforcement or to the public welfare. And whereas a commercial enterprise may have the resources to bear a treble-damages award, the same cannot be said of most nonprofit organizations.[19]

The Court is so zealous to impose treble-damages liability that it ignores a basic purpose of the Sherman Act: the preservation of *private* action contributing to the public welfare. See *United States* v. *United States Gypsum Co.*, 438 U. S.,

---

Act that antitrust plaintiffs demonstrate a contract, combination, or conspiracy. Indeed, the Court never identifies who conspired with whom. Did James—acting for ASME—conspire with Hardin—acting for McDonnell & Miller, Inc., and Hartford Steam Boiler Inspection and Insurance Co.? Or was it the other way around? Could it be said, under the Court's theory, that James had conspired with himself—as a double agent—thereby committing both of his "principals" to an antitrust conspiracy? In my view, it makes more sense to view the matter as a conspiracy between the agents of McDonnell & Miller, Inc., and Hartford Steam Boiler Inspection and Insurance Co. The Court's theory makes possible ratification by ASME irrelevant. In this light, ASME was as much a victim of this conspiracy as Hydrolevel.

[19] It is relevant to note that a nonprofit organization cannot reduce the burden of a treble-damages award by deducting the award as a business expense. See P. Areeda & D. Turner, Antitrust Law § 311a (1978) ("treble damages are generally a deductible business expense for federal income tax purposes").

at 438–443. ASME industry standard-setting can have a significant potential for consumer benefit: for example, its boiler safety information can be expensive if consumers are forced to gain it only by their own experience or by the creation of another bureaucracy. The Court's policy discussion takes no account of this potential cost. Rather, it appears to be so concerned with imposing liability that it puts at risk much of the beneficial private activity of the voluntary associations of our country.

How far the Court's holding extends is unclear. The Court emphasizes that ASME is a standard-setting organization. Yet it does not limit its rationale to these particular organizations. One must be concerned whether the new doctrine and the sweep of the Court's language will be read as exposing the array of nonprofit associations—professional, charitable, educational, and even religious—to a new theory of strict liability in treble damages.